Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/06/2022 09:06 AM CDT

- 302 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

In re Interest of Jay'Oni W. et al.,
children under 18 years of age.
State of Nebraska, appellee, v.
Breyonna W., appellant.

___ N.W.2d ___

Filed August 30, 2022.    No. A-21-990.

1. **Juvenile Courts: Evidence: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another.

2. **Parental Rights: Proof.** Terminating parental rights requires both clear and convincing evidence that one of the statutory grounds enumerated in Neb. Rev. Stat. § 43-292 (Reissue 2016) exists and clear and convincing evidence that termination is in the best interests of the children.

3. **Evidence: Words and Phrases.** Clear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existences of a fact to be proven. It is more than a preponderance of evidence, but less than proof beyond a reasonable doubt.

4. **Parental Rights: Proof.** Neb. Rev. Stat. § 43-292(7) (Reissue 2016) operates mechanically and does not require the State to adduce evidence of any specific fault on the part of the parent.

5. **____: ____.** Any one of the bases for termination codified by Neb. Rev. Stat. § 43-292 (Reissue 2016) can serve as a basis for termination of parental rights when coupled with evidence that termination is in the best interests of the children.

6. **Parental Rights.** When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights.

7. **Parental Rights: Time.** The 15-month condition contained in Neb. Rev. Stat. § 43-292(7) (Reissue 2016) provides a reasonable timetable for parents to rehabilitate themselves.
8. **Parental Rights.** Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity.

Appeal from the Separate Juvenile Court of Douglas County: Amy N. Schuchman, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Lauren A. Walag for appellant.

Kristin Huber, Deputy Douglas County Attorney, and Traemon Anderson, Senior Certified Law Student, for appellee.

Pirtle, Chief Judge, and Bishop and Welch, Judges.

Pirtle, Chief Judge.

## INTRODUCTION

Breyonna W. appeals from an order of the separate juvenile court of Douglas County terminating her parental rights with respect to one of her minor children, Jasmine W. For the reasons that follow, we affirm.

## BACKGROUND

We are tasked with reviewing the termination of Breyonna's parental rights with respect to her daughter Jasmine, born in 2013. However, Jasmine is only one of three children involved in the underlying juvenile court proceedings, as Breyonna is also the biological mother of Jasmine's two younger sisters, Ja'Niyah W., born in 2018, and Jay'Oni W., born in 2020. All three children resided with Breyonna until they were removed from Breyonna's care in March 2020. Thereafter, all three children were placed together in a kinship foster home, and despite Ja'Niyah's being placed with her father for a period of time, all three children remained placed together as of the termination hearings in September and October 2021. As far as we are aware, all three children continue to reside together in

- 304 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

a kinship foster home, and Breyonna's parental rights remain intact with respect to Ja'Niyah and Jay'Oni. Thus, while Ja'Niyah and Jay'Oni will be discussed only as necessary to address Breyonna's claims with respect to Jasmine, this case presents the rather unique circumstance of three siblings that have experienced more or less the same progression through the juvenile court system, yet only one of the three has so far been subjected to the termination of her mother's parental rights.

The present case arose out of an incident on March 22, 2020, in which Breyonna reportedly sent her mother a message threatening to kill Ja'Niyah because Ja'Niyah called Breyonna a "'FAT ASS Bitch.'" In response, Breyonna's mother called law enforcement to conduct a welfare check of the three children, and the responding officers observed the following:

> The house had trash piled up in the corners, trash and dirt all over the floor making it difficult to move around, open containers of food and beverages were littered around the entire house, dirty laundry was piled up in every room, the bathroom had not been cleaned in sometime [sic], used femine [sic] hygeine [sic] products were on the floor, unknown bugs were crawling around the bathroom, the floors and walls had been drawn on and damaged, mold was observed in open containers, there was one bed for all 4 people, and the house smelled of stale and old food.
>
> All the children were dressed in dirty clothes and did not smell clean.

On March 24, 2020, based on the foregoing, the State filed an ex parte motion for immediate temporary custody and a juvenile petition alleging that the three children came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), in that they lacked proper parental care by reason of the fault or habits of Breyonna. The juvenile court granted the ex parte motion and ordered the Nebraska Department of Health and Human Services to take temporary custody of the children.

- 305 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

Cheyenne Wilson, who was the case manager for this family throughout the life of the case, later testified that all three children were initially placed in the home of Breyonna's grandmother. The children remained in that home from March to December 2020, at which point they were placed in the home of Jasmine's paternal great-aunt. Although Ja'Niyah was apparently placed for a time in the home of her father, Wilson testified that at the time of the termination hearings, all three children were placed in the home of Jasmine's paternal great-aunt.

On April 1, 2020, the court found probable cause to support the State's juvenile petition and ordered that the children remain in the temporary custody of the department. Additionally, the court entered a number of orders regarding services for Breyonna and the children. The court ordered that Breyonna "shall have reasonable rights of agency supervised family time/visitation as arranged by the [department]" and "invited" Breyonna to engage in a number of additional services. The court further ordered that "St. Francis is to arrange and provide for services for [Breyonna] as she has indicated she is willing to participate in these services."

On June 11, 2020, Breyonna admitted to "Count I-B and Count I-C" of the juvenile petition in exchange for the State's dismissal of the remaining counts. Specifically, Breyonna admitted that "[o]n or about March 22, 2020, law enforcement officials observed the family home . . . to be in a filthy, unwholesome condition placing said juveniles at risk of harm," and that she "has failed to provide proper parental care, support and/or supervision for said juveniles." Thus, the juvenile court entered an order finding, by a preponderance of the evidence, that all three children were within the meaning of § 43-247(3)(a). The court ordered that Breyonna "shall" attend a psychiatric appointment for medication evaluation, complete a parenting assessment, participate in family support services, participate in agency supervised visitation, complete a co-occurring evaluation, and sign releases of information

- 306 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

"between her probation officer and St. Francis." On July 30, the juvenile court additionally ordered Breyonna to participate in parent-child interactive therapy with Jay'Oni and Jasmine, undergo a psychological evaluation with a parenting assessment, undergo a psychiatric evaluation, maintain a stable source of income, maintain adequate housing, participate in a domestic violence course, and submit to random urinalysis drug testing.

On December 2, 2020, the juvenile court entered an order largely reiterating the previously ordered services, with the exception of the psychological evaluation and the co-occurring evaluation, as Breyonna completed those evaluations in October and November 2020 respectively. As a result of the psychological evaluation, Breyonna was recommended to participate in trauma-based therapy, which the court added to the ordered services. As a result of the co-occurring evaluation, Breyonna was recommended to participate in "Level 2.1 [o]utpatient treatment," which the court added to the ordered services. On March 29, 2021, the juvenile court entered an order reiterating the same ordered services. Although the ordered services still included a psychiatric evaluation, Wilson later testified that Breyonna completed the psychiatric evaluation in February 2021 and that she was recommended "to continue with medication management and to take the prescribed medication and return on a monthly basis."

On April 7, 2021, the guardian ad litem for the children filed an ex parte motion to suspend visitation. The motion was based on an affidavit from a "visitation and family support worker" "outlining her concerns regarding [Breyonna's] visitation, including [Breyonna's] being unable to control her emotions during visits, repeatedly inspecting [Ja'Niyah] for marks on her body and in her vaginal region, apparent deteriorating mental health, and signs of being under the influence." On April 8, the juvenile court granted the motion of the guardian ad litem and entered an ex parte order suspending visitation. On May 12, the court entered an order finding that

- 307 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

"upon agreement of the parties, [Breyonna] shall be allowed to have visitation with [Jay'Oni, Ja'Niyah, and Jasmine] in the form of virtual visitation." Visitation was set to occur once a week, with increased frequency "at the discretion of the case manager." As of the first termination hearing, visitation had not increased beyond once a week, and visits continued to occur virtually.

On June 28, 2021, the State filed a motion for termination of Breyonna's parental rights with respect to Jay'Oni and Jasmine only. The motion alleged that Jay'Oni and Jasmine came within the meaning of Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The motion did not identify any factual basis with respect to the allegations under § 43-292(2) and (7). With respect to the allegation under § 43-292(6), the State listed the court-ordered services that it believed Breyonna had not successfully completed, alleging that Breyonna had failed to do the following: (1) participate in parent-child interactive therapy; (2) obtain and maintain a stable and legal source of income; (3) maintain safe, appropriate, and adequate housing; (4) participate in trauma-focused therapy; (5) submit to urinalysis testing; (6) participate in "Level 2.1 [o]utpatient treatment"; (7) participate in supervised visitation; and (8) follow recommendations of the psychiatric evaluation. The State thus alleged that terminating Breyonna's parental rights with respect to Jay'Oni and Jasmine was in the best interests of the children. Breyonna made her first appearance on the motion for termination on July 1, at which time she entered, and the court accepted, a plea of denial to the allegations in the motion. On July 6, the juvenile court entered an order largely reiterating the ordered services for Breyonna, except Breyonna was no longer ordered to participate in parent-child interactive therapy.

On September 22, 2021, the court held the first of two hearings on the motion for termination of Breyonna's parental rights with respect to Jay'Oni and Jasmine. Wilson was the only witness to testify at the first termination hearing. At

- 308 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

the start of the hearing, the court indicated that "[w]e are here for adjudication on the motion for termination of parental rights regarding Jay'Oni and Jasmine." However, it was eventually revealed that the termination proceedings actually pertained to Jasmine alone, given that an appearance had been entered by Jay'Oni's biological father.

With regard to the court order that Breyonna maintain adequate housing, Wilson testified that "Breyonna has consistently reported that she has had housing . . . . The biggest concern was the appropriateness of the housing." Wilson testified that family support services was "assigned to assist Breyonna with different housing goals." Wilson testified that Breyonna initially worked with her family support worker to address the safety and cleanliness of the home; however, at some point, "the goals shifted, as Breyonna . . . was under the impression that she wasn't going to be able to stay in that apartment, in that residence much longer, and it started shifting towards applying for different housing services." Wilson testified that when she asked to go inside Breyonna's residence, Breyonna "often told [her] that the home is not appropriate and she doesn't want me to come inside." Wilson testified that Breyonna "seems to understand and acknowledge that she needs to address her housing situation." However, Breyonna continued to reside in the same residence at the time of the termination hearings, and there was no indication that Breyonna had made progress toward establishing a home which was safe and suitable for the children.

With regard to the court order that Breyonna maintain a stable source of income, Wilson testified that Breyonna "reported on a couple different times that she has worked at different locations and was also trying to apply for disability." Wilson testified that throughout the pendency of this case, Breanna worked at three different businesses. With respect to two of the businesses, there was no evidence as to the time period during which Breyonna was working at those locations. With respect to the third, Wilson testified only that

- 309 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

Breyonna worked there for "a month or two." According to Wilson, Breyonna reported that she was fired from the third business because "she had been late numerous times to work but that she also wore the wrong clothing for work." With respect to disability, Wilson testified that Breyonna worked with her family support worker to complete an application, but "the next steps required from disability had not been completed and so Breyonna was needing to reapply."

As mentioned above, Breyonna was ordered to participate in Level 2.1 outpatient treatment as recommended by the co-occurring evaluation completed in November 2020. Wilson testified Level 2.1 outpatient treatment is "for both group sessions and individual sessions a couple times a week, two to three times a week." Wilson testified that Breyonna arranged to participate in treatment at the Douglas County Community Mental Health Center (CMHC), and her first appointment was sometime in April 2021. Wilson testified that Breyonna went to at least "a couple" additional appointments at CMHC and did not report any issues.

At some point, Wilson contacted CMHC and a "treatment provider" recommended to her that Breyonna complete an updated chemical dependency evaluation, "as there was concern that maybe the Level 2.1 outpatient [treatment] was not sufficient for Breyonna." An updated chemical dependency evaluation recommended that Breyonna participate in residential treatment. Wilson testified that "Breyonna was not resistant to going" and that "[s]he was open to getting help through a residential treatment facility." Breyonna arranged to participate in residential treatment at "Stephen Center" beginning on August 25, 2021. However, Wilson testified that Breyonna was unsuccessfully discharged from Stephen Center on September 6 because Breyonna "felt [a peer] had made a threat to her. . . . Breyonna had talked with staff at the Stephen Center [and] did not feel it was handled appropriately. Breyonna had made a statement that she could possibly burn the place down."

- 310 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

After being discharged from Stephen Center, Breyonna arranged for residential treatment at "Family Works." Breyonna was scheduled to begin treatment at Family Works on September 21, 2021, the day prior to the September 22 hearing. However, Breyonna did not show up to Family Works as scheduled. Wilson testified that Breyonna would need to call Family Works to set up a new appointment, but it is unclear if that was ever done.

With regard to the court order that Breyonna participate in trauma-focused therapy, Wilson testified that such would have been completed "at the same time" as Breyonna's chemical dependency treatment. Wilson testified that "we had already had the recommendation for her treatment for substance use and [trauma-focused] therapy would have and could have been completed during that time in both treatments." This would seem to suggest that Breyonna was supposed to participate in trauma-focused therapy as part of her Level 2.1 outpatient treatment at CMHC and then her residential treatment at Stephen Center and, prospectively, at Family Works. However, there was no mention of trauma-focused therapy in those contexts. Wilson ultimately testified that Breyonna did not participate in trauma-focused therapy, although Wilson testified that Breyonna appeared to understand the importance of both "chemical dependency and trauma-focused treatment" and "was willing to engage in those services."

As mentioned above, Breyonna completed the court-ordered psychiatric evaluation in February 2021 and, according to Wilson, was recommended to "continue with medication management and to take the prescribed medication and return on a monthly basis." Wilson testified that Breyonna was "willing to participate" with that recommendation; however, Wilson suggested that Breyonna was somewhat ambivalent about taking her medications and attending appointments. Wilson testified as follows:

> Breyonna indicated at times that she was not taking her medication. There were times where she reported she

- 311 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

would — she liked taking her medication. There were times she reported she didn't like her medication and that she didn't want to take it. That it made her feel different. And I had suggested she talk with her doctor and return to other appointments. Breyonna had reported that she had gone to some of those appointments but was not always consistent in taking her medication.

Wilson added, "I believe [Breyonna] has an appointment scheduled [in October], but I believe it has been at least a couple months before — since she has been to that appointment." Wilson testified that she last spoke to staff at the psychiatrist's office in August 2021, and they told Wilson that Breyonna "did not attend every appointment that was on a monthly basis but had attended some of them." Wilson also testified that Breyonna reported she was taking her medication at Stephen Center but "had not been taking it once leaving."

With regard to supervised visitation, Wilson testified that due to the COVID-19 pandemic, the initial visits were entirely virtual. Wilson testified that in-person visits began in "June or July of 2020." Wilson testified that the initial virtual visits occurred "maybe three to five times a week," and once in-person visits began, they were scheduled for "about three times a week." Wilson testified that Breyonna's visits were initially supervised through an agency called Apex, but that Breyonna was discharged in "June or July of 2020" due to her lack of participation in visits.

Wilson also testified that Breyonna was incarcerated on two different occasions during this case, and Wilson confirmed that Breyonna was not able to participate in any visits, virtual or otherwise, while incarcerated. Wilson testified Breyonna was initially incarcerated for "around a month" due to "an altercation with a person she had been in a relationship with." Wilson's testimony indicates that the first period of incarceration occurred sometime between July and August 2020. According to Wilson, Breyonna was incarcerated a second time for "just shy of two weeks" due to a violation of probation.

- 312 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

Wilson testified that Breyonna was on probation for child abuse and neglect as a result of the incident that resulted in the children's removal, and she was incarcerated for violating probation requirements such as complying with juvenile court orders, working toward reunification, and refraining from substances. It is unclear when the second period of incarceration occurred, although Wilson indicated elsewhere that Breyonna spent "some time in jail" around June or July 2021.

After Breyonna was discharged from visitations through Apex, Wilson testified that visits recommenced with an agency called Capstone after Breyonna was released from jail, which, despite the testimony above, Wilson indicated was not until November 2020. Wilson testified that the Capstone workers reported some difficult behaviors from Jasmine and Ja'Niyah during visits, adding that both Breyonna and the visitation workers had difficulty redirecting the children. Due to difficulties controlling all three children at the same time, Wilson testified that visits were split such that Breyonna visited with Jasmine and Jay'Oni at one time and with Ja'Niyah at another time. Wilson further testified that, at some point, Capstone communicated additional concerns "regarding consistency and just quality of the visits, conversations that were happening during visits."

Wilson testified that Capstone continued to supervise visits at the time of the termination hearings, which, in accordance with the court's May 12, 2021, order, were occurring once a week through a virtual platform. When asked about the purpose for the order limiting visits to one virtual visit a week, Wilson testified it was due to an incident in March 2021 in which Breyonna had "interrogated Jasmine regarding whether or not she was taking her own ADHD medication." According to Wilson, "[t]he visitation worker had stated that she had tried to redirect this conversation but Breyonna continued and this brought Jasmine to tears, really struggling with why her mom did not believe her and why this was happening." Wilson testified that she spoke to Breyonna about this incident and that

- 313 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

Breyonna stated "she did ask Jasmine but Jasmine never cried and . . . she didn't understand why that was an issue."

A second motion to suspend visitation was filed on September 30, 2021, and attached thereto was an affidavit in which the visitation worker attested that a September 17 virtual visit was cut short due to "the rapid decline" in the children's moods. The visitation worker added that it was "very clear Breyonna . . . was on substances and unable to withstand any conversation with the youth." The visitation worker further attested that a September 24 virtual visit was similarly cut short after "the good natured mood among the youth rapidly changed to chaos and crying."

A significant amount of time at the first termination hearing, and nearly the entirety of the second termination hearing, was spent discussing court-ordered drug testing and Breyonna's compliance therewith. Wilson testified that Breyonna was initially referred for drug testing with an agency called "Owens & Associates." Wilson testified that Breyonna did not participate in "the majority" of her drug tests through Owens & Associates. According to Wilson, Breyonna reported "on multiple occasions that she was willing to test but she didn't want to because she would be positive for marijuana." Breyonna ultimately participated in only 4 out of 16 tests attempted from August 30 to November 4, 2020. In the first three completed tests, Breyonna tested "presumptive positive" for marijuana and negative for all other drugs. In the fourth completed test, Breyonna tested negative for all drugs. Breyonna was discharged from Owens & Associates on November 5, 2020, for missing 12 out of 16 attempted tests. Notably, Wilson testified that Breyonna was discharged in "August of 2020," but the testimony of a supervisor from Owens & Associates and the related exhibit clearly refuted that testimony.

Wilson testified that Breyonna was subsequently referred for drug testing with Capstone and that such testing occurred in August 2020. However, a supervisor from Capstone testified that Breyonna began testing with it in November, which

- 314 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

is consistent with her discharge from Owens & Associates. He testified that Breyonna was ultimately discharged in June 2021 for lack of participation and that during those 6 months, Breyonna participated in only 3 of 85 attempted tests. However, the exhibit he prepared shows only the attempted tests from February through June 2021. This may be explained by the fact that Capstone briefly discharged Breyonna in January before "immediately" accepting the referral again that same month. Thus, it appears the supervisor from Capstone prepared only the records from the second period of testing, and during that period of time, there is only a record of one completed test which was negative for all substances.

While the actual results were not entered into evidence, the record nevertheless indicates that Breyonna tested positive for methamphetamine at least once during the first period of testing with Capstone. Wilson testified that she approached Breyonna about one of the November 2020 test results and that Breyonna reported "her neighbor may have laced her joint with methamphetamine." Moreover, on December 2, the juvenile court ordered that "Saint Francis Ministries shall ascertain from [Breyonna's] chemical dependency evaluator whether or not a higher level of care is warranted, given her recent positive test for methamphetamine."

After being discharged from Capstone in June 2021, Breyonna was referred again to Owens & Associates. Breyonna was eventually discharged from Owens & Associates in August, due to her entering residential treatment at Stephen Center. In those 2 months with Owens & Associates, Breyonna completed 7 of 12 attempted tests. In the first six completed tests, Breyonna tested negative for all drugs. In the seventh completed test, Breyonna tested "presumptive positive" for methamphetamine and negative for all other drugs.

Regarding Jasmine's progress during the case, Wilson testified that Jasmine was diagnosed with "ADHD," and when Wilson first met her, Jasmine "was very hyperactive. She was very difficult to have a conversation with. She could

- 315 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

not sit still. She was very disrespectful towards her great-grandmother, . . . her foster parent." Wilson also pointed out that Jasmine was "very rough with her younger sisters" and that she "appeared as if she had a lot of responsibility and knew a lot that kids her age are typically not responsible for." Wilson saw Jasmine on a monthly basis, and when she last saw Jasmine in September 2021, she noticed "significant improvements, even in school, being able to identify letters and read on her own. She is excited about school. She is able to sit down and actually be very calm and have a conversation." Wilson said that Jasmine "really made a lot of progress in being able to understand and verbalize things that she wants and that she needs." Further, Jasmine was "much more age-appropriate with her siblings at this time."

Wilson ultimately testified to her opinion that it would be in Jasmine's best interests for Breyonna's parental rights to be terminated. As to the basis of that opinion, Wilson testified as follows:

> Throughout my time working with Breyonna and Jasmine, Breyonna has not shown an ability to be consistent or meet the needs of Jasmine. She has not made significant progress in this case to address her own mental health and substance use needs to put herself in a position to parent her child. I have seen Jasmine make such huge progress in the time that she has been able to be in foster care and be in a position where she is getting not only some stability and consistency but the ability to not have to parent her younger siblings and to be a kid and focus on her school and the things that she wants to do and enjoys to do.

With regard to Jasmine's input, Wilson testified that "[s]he says she loves her mom, she misses her mom, she's very worried about her mom, and wants her mom to get help."

After adducing the urinalysis-related testimony of the supervisor from Owens & Associates and the supervisor from Capstone at the second termination hearing, the State rested

- 316 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

and submitted the matter on the evidence without argument. The guardian ad litem for the children did not adduce any evidence or provide any argument. The defense provided a brief argument, emphasizing Breyonna's cooperation and engagement with services and asserting that the State failed to meet its burden to terminate parental rights.

On November 15, 2021, the juvenile court entered an order terminating Breyonna's parental rights with respect to Jasmine only. The court found that the State had proved, by clear and convincing evidence, statutory bases for termination under § 43-292(2), (6), and (7) and that termination of Breyonna's parental rights was in the best interests of Jasmine. With regard to the allegations under § 43-292(6), the court found that each was true by clear and convincing evidence, except the court dismissed allegations (1) and (6) above. The court thus terminated Breyonna's parental rights with respect to Jasmine, and Breyonna brought this appeal.

## ASSIGNMENTS OF ERROR

Breyonna assigns that the juvenile court erred in terminating her parental rights because the State failed to prove by clear and convincing evidence that Jasmine was within the meaning of § 43-292(2), (6), and (7) and because the State failed to prove by clear and convincing evidence that termination was in the best interests of Jasmine.

## STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

- 317 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

## ANALYSIS

[2,3] Under Nebraska law, terminating parental rights requires both clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and clear and convincing evidence that termination is in the best interests of the children. See *In re Interest of Donald B. & Devin B.*, 304 Neb. 239, 933 N.W.2d 864 (2019). Clear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existences of a fact to be proven. *In re Interest of Kindra S.*, 14 Neb. App. 202, 705 N.W.2d 792 (2005). Further, clear and convincing evidence is more than a preponderance of evidence, but less than proof beyond a reasonable doubt. *Id.*

*Statutory Grounds for Termination.*

[4,5] The State alleged a number of statutory grounds for termination, including § 43-292(7), which allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more of the most recent twenty-two months." Section 43-292(7) operates mechanically and does not require the State to adduce evidence of any specific fault on the part of the parent. See *In re Interest of Mateo L. et al., supra.* Any one of the bases for termination codified by § 43-292 can serve as a basis for termination of parental rights when coupled with evidence that termination is in the best interests of the children. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

In this case, the juvenile court found that Jasmine came within the meaning of § 43-292(7). Based on our de novo review of the record, we also find clear and convincing evidence that Jasmine came within the meaning of § 43-292(7). Jasmine was removed from Breyonna's care and custody in March 2020 and never returned. On appeal, Breyonna concedes that Jasmine has been in foster care beyond the statutory timeframe set forth in § 43-292(7). Thus, there is no doubt that Jasmine came within the meaning of § 43-292(7), and

Breyonna's assignment of error regarding statutory grounds for termination is without merit.

*Best Interests.*

Based on our de novo review of the record, we conclude the juvenile court did not err in finding clear and convincing evidence that termination of Breyonna's parental rights was in Jasmine's best interests. We arrive at this conclusion because the evidence regarding Breyonna's continued drug use, lack of income, lack of suitable housing, and overall lack of progress toward reunification raises serious concerns about Breyonna's parental fitness and her ability to rehabilitate herself within a reasonable period of time. Additionally, Jasmine had made "significant improvements" since being removed from Breyonna's care. Where Jasmine had been "hyperactive," difficult to converse with, unable to sit still, and "very rough with her younger sisters" when she was initially removed from Breyonna's care, Jasmine had improved in foster care to being able to understand and verbalize things better, she could sit down and calmly have a conversation, and she was "much more age-appropriate with her siblings."

[6-8] When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C., supra*. The 15-month condition contained in § 43-292(7) provides a reasonable timetable for parents to rehabilitate themselves. *In re Interest of Leyton C. & Landyn C., supra*. Furthermore, children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

After 18 months of court-supervised rehabilitation efforts, Breyonna has failed to make meaningful progress toward putting herself in a position to parent her children. Breyonna failed to participate in the vast majority of court-ordered drug testing, and of the tests that were completed, many were

- 319 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

positive for substances. Breyonna apparently held three different jobs during the 18 months of proceedings, yet she failed to maintain any of those positions for an extended period of time. Despite the condition of Breyonna's residence being the primary basis for the children's removal, Breyonna remained in that residence at the time of the termination hearings, and despite the efforts of family support services, there was no indication that the condition of the residence had improved. Breyonna never progressed beyond supervised visitation with the children, and visitation workers repeatedly expressed concerns about Breyonna's behavior during visits and the negative impact that such behavior had on the children. Breyonna's conduct during visitation ultimately resulted in her being limited to one virtual visit per week. Altogether, the record demonstrates clear and convincing evidence of present parental unfitness, and despite ample opportunity, Breyonna failed to take meaningful steps toward rehabilitating herself. Thus, we affirm the order of the juvenile court terminating Breyonna's parental rights as to Jasmine.

As a cautionary note, we point out that the record in this case is lacking evidence that would have been helpful to our de novo review of Jasmine's best interests. Aside from a single affidavit discussing two virtual visits, the record is devoid of evidence adduced directly from individuals who were actually present for visits between Breyonna and the children. Wilson testified that she had never been present at any of the visits, and her testimony was limited to reiterating generalized concerns reported to her from visitation workers. Our ability to assess the nature of visits is further impacted by the absence of any documentary evidence such as periodic court reports or notes from visitation workers. As such, we are reliant on Wilson's recollection of those reports to conduct our de novo review.

Moreover, while Wilson suggested that Breyonna was not adequately addressing her psychiatric needs, the record is inexplicably devoid of any evidence regarding Breyonna's

- 320 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
31 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

psychiatric diagnoses, prescription medications, or treatment goals. At oral argument, the State indicated that this was because Breyonna failed to sign releases of information such that Wilson was not able to obtain this information. However, the record refutes that claim. Wilson specifically testified to speaking directly with Breyonna's psychiatrist and getting periodic updates on Breyonna's "compliance with appointments." Wilson further testified that she never had an issue with Breyonna's declining to sign a release of information in this case.

Perhaps most importantly, there was no testimony or other evidence regarding the impact that terminating Breyonna's parental rights may or may not have on Jasmine, especially considering the fact that Breyonna's parental rights remained intact with respect to Jasmine's younger sisters who were both placed with Jasmine in the same foster home. The State failed to adduce evidence directly from many of the people most able to testify as to Jasmine's present condition and future well-being. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005) (observing that State failed to present testimony or other evidence from therapists, family support workers, foster parents, and others who directly observed parties). Rather, the State relied primarily on a single caseworker who testified that she saw Jasmine only once a month.

As the present case illustrates, evidence that a parent is presently unfit, when coupled with a demonstrated inability or unwillingness to rehabilitate oneself within a reasonable period of time, can supply the information necessary to determine the best interests of the child. However, it must not be forgotten that the focus of a termination proceeding is the juvenile, not the parent. See *id.* Thus, evidence of parental deficiencies should not be adduced to the exclusion of additional evidence relevant to the present condition and future well-being of the child.

In *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016), the Nebraska Supreme Court was presented with a

- 321 -

Nebraska Court of Appeals Advance Sheets
31 Nebraska Appellate Reports
IN RE INTEREST OF JAY'ONI W. ET AL.
Cite as 31 Neb. App. 302

record that was similarly lacking certain evidence relevant to the best interests analysis. In that case, the court observed that while filling in the gaps could have aided appellate review, the lack of all the "'gory details'" does not necessarily mean the State failed to meet its burden of proof. *Id*. at 795, 884 N.W.2d at 708. Likewise, in this case, we conclude that the State satisfied its burden of proof despite failing to adduce evidence that could have aided our de novo review.

## CONCLUSION

For the foregoing reasons, we affirm the order of the juvenile court terminating Breyonna's parental rights to Jasmine.

Affirmed.