IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF NAELANI P. & GIOVANNI P.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF NAELANI P. & GIOVANNI P., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

KYLEE S., APPELLANT, AND JUELLIAN P., APPELLEE AND CROSS-APPELLANT.

Filed August 29, 2023.    Nos. A-23-089, A-23-090.

Appeals from the County Court for Scotts Bluff County: KRIS D. MICKEY, Judge. Affirmed.

Rhonda R. Flower, of the Law Office of Rhonda R. Flower, for appellant.

Travis R. Rodak, Deputy Scotts Bluff County Attorney, for appellee State of Nebraska.

Leonard G. Tabor, for appellee Juellian P.

PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

MOORE, Judge.

## I. INTRODUCTION

Kylee S. appeals and Juellian P. cross-appeals, from an order of the Scotts Bluff County Court sitting as a juvenile court, terminating their parental rights to their minor children. The court found that termination of their parental rights was proper under Neb. Rev. Stat. § 43-292(2), (4), (6), and (7) (Reissue 2016) and that termination of their parental rights was in the children's best interests. Upon our de novo review of the record, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. PETITION, ADJUDICATION, AND REVIEW

Kylee is the mother and Juellian is the father of Giovanni, born in June 2018, and Naelani, born in March 2020. The children were removed from their parents' care and placed in the custody of the Nebraska Department of Health and Human Services (the Department) on October 8, 2020, due to concerns of methamphetamine use and domestic violence in the home. The children have remained in out-of-home placements since that time.

On October 8, 2020, the State filed petitions in the juvenile court, alleging that Giovanni and Naelani were minor children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) and lacked proper parental care due to the fault or habits of their parents. Specifically, the State alleged that the children were at risk for harm because of their parents' use of controlled substances, their parents engaged in domestic violence in their presence, and their parents did not and could not provide them with appropriate parental care. The State also filed motions for temporary custody of the children, which the court granted.

On October 14, 2020, following a protective custody hearing, the juvenile court ordered Kylee and Juellian to participate in drug testing via sweat patch.

On December 10, 2020, the juvenile court entered orders adjudicating Giovanni and Naelani as children within the meaning of § 43-247(3)(a). The court ordered the Department to prepare a case plan and court report, and it again ordered Kylee and Juellian to participate in drug testing.

The juvenile court entered dispositional orders on January 12, 2021, continuing the children's out-of-home placement after finding that the Department had made reasonable efforts to make it possible for the children to return to their home. The court adopted the Department's case plan and ordered the parties to comply with its provisions. The court also ordered Kylee and Juellian to complete "the IDI and substance abuse evaluation." The primary permanency goal at that time was reunification. A secondary permanency goal of adoption was added in June 2021. The court adopted similar case plans following review hearings on March 30, June 29, and October 5, 2021; and January 6, April 5, June 30, and September 30, 2022. Following the April 2022 review hearing, the court ordered the Department to begin a transition period of overnight visits when the parents started testing negative for drugs consistently.

The parents' case plan goals throughout were directed toward their use of illegal substances. The initial strategies to meet those goals required them to comply with drug testing; obtain substance abuse and mental health evaluations and follow the recommendations of those evaluations; avoid people, places, and things tied to illegal substance use; and seek support from family, friends, and community in support of a sober lifestyle. Kylee's strategies also required her to attend and complete "DBT Group, Circle of Security, and Women's Trauma" to learn effective coping and parenting skills and process her prior traumatic experiences, and to develop a plan to ensure her and the children's safety if Juellian became violent. In subsequent case plans, both parents were also required to comply with the conditions of their probation. The final case plans in the record (dated June 2022) also included a requirement that the parties maintain a positive co-parenting relationship free from yelling, hitting, kicking, stabbing, or other violent behavior

and that Juellian develop a safety plan to ensure his and the children's safety if Kylee became violent.

## 2. TERMINATION MOTION AND HEARING

On August 31, 2022, the State filed motions seeking termination of Kylee's and Juellian's parental rights. The State alleged that termination was proper pursuant to § 43-292 (2), (4), (6), and (7) and that termination of Kylee's and Juellian's parental rights was in the children's best interests.

A termination hearing was held before the juvenile court on November 30, 2022. The court heard testimony from multiple case workers, a family support worker, a psychologist, a probation officer, a police officer, and substance abuse counselors who worked with the parents during the course of this case. The court received various documentary exhibits into evidence, including copies of criminal proceedings involving the parents, various case plans and assessments performed by the Department, and drug test results for the parents. The parties stipulated at the beginning of the termination hearing that the children had been in out-of-home placement for 25.6 months.

### (a) Criminal Records

The criminal records received into evidence show that Juellian was convicted of third degree domestic assault in December 2020. In a separate case, he was convicted of third degree assault, threaten another in menacing manner. In March 2021, he was sentenced to 24 months' probation in both cases. The terms of his probation sentences included a requirement that he enter and complete drug court and be subject to random drug testing by Probation. The exhibits received into evidence do not reference whether these sentences were made concurrent or consecutive to one another.

Kylee pled no contest or guilty to a charge of third degree domestic assault in December 2020, and in February 2021, she was sentenced to 15 months' probation. The terms of her probation required that she not use or possess controlled substances, except by prescription, and also required her to submit to random drug testing. Then, in July 2022, she was charged with possession of methamphetamine and fentanyl. When she did not appear for a pretrial conference in October, a bench warrant was issued for her arrest.

Royce Massie, a patrol corporal with the Scottsbluff Police Department, assisted with a probation search of Kylee's residence on July 7, 2022, that led to the charges against her for possession of fentanyl. A probation officer located over 20 suspected fentanyl pills in a chest at the foot of a bed during the search. Kylee and the children were present in the residence at the time. Massie testified to his concern that the chest where the pills were discovered was located "at ground level and could be accessed by the children." Massie arrested Kylee at that time and testified that she was currently incarcerated although he did not know for what offense.

### (b) Compliance With Probation

Adrian Rubottom, Juellian's probation officer, testified that Juellian would be on probation until March 10, 2023, although he could possibly be released from probation "at half of [his] time" if he successfully completed the drug court program in which he was participating. Rubottom

testified about the terms of Juellian's probation and stated that Juellian had been doing "very well" on probation, having made "significant improvements," was currently employed, and had his own apartment and transportation. Rubottom also noted Juellian's completion of mental health counseling and his attendance at out-patient counseling, a men's group, and the Responsible Thinking class. According to Rubottom, Juellian had been meeting the requirements of the drug court program, including not missing any drug tests, testing negative for drugs, and attending at least two sober support meetings such as AA or NA each week.

Probation utilizes "UAs and mouth swabs" in its drug testing and also performed sweat patch testing for the Department in this case. Rubottom indicated that each time Juellian gets a patch changed he also submits to a urine test. While the urine tests screened for fentanyl, the sweat patches did not start screening for fentanyl until October 2022. During Juellian's time on probation, he received 217 drug tests, with four of the sweat patch tests yielding positive results. On June 10 and 21, 2022, he tested positive for methamphetamine; on July 19, he tested positive for methamphetamine and marijuana; and on October 18, he tested positive for fentanyl. During this time, Juellian's levels of methamphetamine were decreasing. Rubottom testified about two other test results, a sweat patch test from November 8 (results negative for all substances, including fentanyl) and a hair follicle test from November 22 (tested for amphetamines, cocaine, marijuana, opioids, and PCP, with negative results). As a probation officer, Rubottom has seen different results from a urine sample and a sweat patch sample on more than one occasion, an issue that can result from the different "cutoff levels" of different drug test methods and which is why hair follicle tests, which "can go back 90 days to test the presence of a substance," are sometimes performed. Rubottom was not certain whether the hair follicle tests actually tested for fentanyl.

Rubottom testified that Juellian had been "[e]xtremely" cooperative with him and noted Juellian's report to him of a positive hair follicle test for methamphetamine in August 2022. Juellian had recently served a jail sanction (for replacing a sweat patch that had fallen off, so that it appeared tampered with), but Rubottom testified that compared to some drug court participants, Juellian has not had to serve many jail sanctions for program violations. In general, Rubottom praised Juellian's efforts toward becoming sober. While Juellian's positive test results for methamphetamine and fentanyl were concerning to him, Rubottom noted Juellian's efforts to do everything asked of him in terms of "therapy, classes, making appointments," and he noted good reports of Juellian's parenting during visitations.

(c) Substance Abuse Counseling

Substance abuse counselor Kat Vallejo first met Juellian when he began drug court in May or June 2021. Juellian began individual counseling with Vallejo in July and continued counseling with her through the time of trial, "[m]ostly once a week." Vallejo was counseling him as to healthy coping skills, boundaries, and relationships, as well as relapse prevention, and he was attending her men's group. According to Vallejo, Juellian could have completed the weekly men's group "quite a while ago," but he chose to continue attending it. Juellian also completed the "Responsible Thinking group." Vallejo described the purpose of that group as being "to challenge your current way of thinking and looking at things and making better choices . . . [m]ore responsible choices." Vallejo felt that Juellian had done well during his time in counseling, and he had even reached out

to her outside of business hours when he needed extra support. Vallejo stated that Juellian had "made incredible progress from when he first started."

Vallejo did not believe Juellian was currently using drugs although she acknowledged she did not really know whether he was using. She testified that he did not exhibit any behaviors or attitudes that would suggest that he had been using drugs. Vallejo stated that methamphetamine was Juellian's "drug of choice," and while she acknowledged that Juellian had received some positive tests for fentanyl, she expressed concern about apparent discrepancies between the results from different testing methods (urine, sweat patch, and hair follicle).

Daniel Palomo, a licensed alcohol and drug counselor, has been involved with Juellian since he was a juvenile and was currently having substance abuse counseling sessions with Juellian twice a month. Palomo felt that Juellian had "come a long way" in counseling, noting that Juellian had an apartment, was participating in drug screening, was making appointments for visitation, and was participating in the drug court program. Palomo did not believe that Juellian had been using drugs since his relapse about 7 months prior, and he expressed his belief that Juellian decided to "get more serious" about sobriety once he "realized that losing his kids was on the line." Palomo seemed generally optimistic about Juellian's progress toward sobriety. Palomo indicated that he would continue to provide counseling for Juellian "as long as it doesn't intervene with drug court . . . and whatever he has going on with them concerning his mental health." According to Palomo, "when the fentanyl situation came up, [Juellian] was pretty upset, told [Palomo] he didn't use."

(d) Child-Parent Psychotherapy

Dr. Mark Hald, a psychologist, performed an assessment of Giovanni in the summer of 2021, which showed "some significant developmental delays," and he conducted child-parent psychotherapy sessions with Giovanni and each parent (eight sessions with Kylee and four with Juellian). Between June 2021 and April 2022, there were eight cancelled sessions because of "various conflicts," with six of the cancellations being unexplained "no-shows." Hald had four sessions with Kylee and Giovanni before the first session with Juellian, which was in October. Hald described Giovanni initially as being "kind of in his own little bubble" and indicated that he did not have a lot of eye contact with Kylee. He also described Giovanni as "isolated" and "very frozen" and stated that he did not speak much at all. Hald worked with the parents on understanding Giovanni's developmental needs and ways in which they could strengthen their connection with him. During Hald's time working with the family, he observed positive changes in the interactions between Giovanni and each parent. Hald described the parents as "both very open to ideas" and "honest" about the struggles they had had with substance abuse, fighting, and yelling. Hald testified that the parents were willing to "think" with him about the impact their personal issues may have had on Giovanni. Sessions scheduled in early 2022 were cancelled due to the weather and COVID-19. Hald closed the case in April 2022 because "[n]obody showed up" for a scheduled session. He testified that during the period he worked with the parents and Giovanni, he "saw good progress" in terms of each parent's interactions with Giovanni, but he testified that child-parent psychotherapy typically lasts for about a year. According to Hald, when this case was closed, they were "just getting the surface scratched."

In addition to the initial assessment worker for the Department and a family support worker, three case workers testified about the parents' compliance with the requirements of their case plans. The initial assessment worker transferred the case to Kylie Kindred on October 27, 2020, who managed the case until she transferred it to Kadee Bayless on June 3, 2021. Bayless managed the case from then until February 17, 2022, when she transferred it to Megan Tofflemire, who was managing the case at the time of the termination hearing.

### (i) October 2020 Through May 2021

Kindred completed a family strengths and needs assessment on both parents to help formulate their case plan goals. To address the identified needs, the Department provided supervised visitation services and drug patch testing, and it coordinated with Probation for some of the required evaluations. Both parents completed substance abuse evaluations with Palomo and were attending intensive outpatient programming. The Department referred the parents for initial diagnostic evaluations to see if there were any underlying mental health issues that could contribute to their substance abuse, but those evaluations were not completed during Kindred's time managing the case. Both children were evaluated by the Early Development Network and referred to the genetics clinic. A recommended evaluation of Giovanni for autism was not completed while Kindred managed the case. The Department also had family team meetings with both parents.

Kindred testified that during her time on the case, the parents "both tested positive consistently for methamphetamines, amphetamines, and THC." She indicated that during her time on the case, Probation collected 20 patches from Juellian and 24 from Kaylee for the Department and that the results of all of those tests were positive.

According to Kindred, during this period, Juellian did not have housing and was "kind of couch surfing," and he was "just working for different construction type jobs." Kylee had housing but needed to relocate near the end of the period due to the owner's decision to sell the residence. She had a couple of jobs; she left a job at a bakery due to the early morning hours required, her next job at a deli ended due to the pandemic.

During Kindred's time managing the case, the parents each had 20 hours of supervised visitation with visits occurring either at the service provider's visitation center, Kylee's residence, or another location. By the end of the period, they each still had approximately 20 hours of supervised visitation per week although the Department had devised a timeline for Kylee to progress to unsupervised visits.

From November 2020 through the end of May 2021, Juellian attended 63 visits; he "no-showed" or cancelled 10 visits; and 4 visits ended early. Initially, Juellian had to be redirected frequently with regard to parenting Giovanni, but over time, Juellian became "more consistent" and was "more attentive" to the children's needs.

Kylee attended 53 visits, "no-showed" or canceled 14 visits, and 6 visits were ended early. She also needed redirection in attending to Giovanni's needs and in responding to the emotional cues of both children. Kylee was attentive to changing the children's diapers, and her mother assisted in making sure Kylee had food at her visits. During this period, the majority of Kylee's visits occurred in her residence, but visits were held at the visitation center at one point due to "a

very strong odor of THC that caused the visitation aide to have a headache." Visits resumed in the home after an updated walk-through was performed to ensure the home did not smell of THC, Kylee had toys and other items for the children, and there were no safety concerns.

Kindred testified about her concerns at the point when she transferred the case to Bayless. At that point, neither parent had done a mental health evaluation, and although they were still participating in treatment, they both continued to receive positive drug tests. Kindred noted in particular that Kylee relapsed on heroin during this period, but that Kylee was working with Probation to get into an opioid program. The parents had expressed the possibility of resuming their relationship, which concerned Kindred because nothing had really been done to address the domestic violence that occurred at the start of the case. Finally, Kindred noted that both parents participated in family team meetings, although Juellian was sometimes difficult to contact outside of that context. If Kindred was unable to get ahold of Kylee, Kindred was usually able to connect with her with the help of Kylee's mother. Kylee was responsive when Kindred reached out to her.

*(ii) June 2021 Through January 2022*

The Department's concerns when Bayless took over the case included the parents' "significant history" of domestic violence, their drug use, and Giovanni's behavioral issues. Bayless testified that when she received the case from Kindred, it was not clear whether the parents were "together." She characterized them as "doing okay" with respect to their drug use at that point. Services offered by the Department during Bayless' time on the case included day care, working closely with the schools for both children, "Early Development Network," "Healthy Families," speech therapy for Giovanni, and the provision of phone cards and grocery vouchers. Bayless continued to work with Rubottom with respect to counseling and other services set up through Probation.

When Bayless began managing the case, the parents were still each receiving about 20 hours per week of supervised visitation. She noted the plan set up by Kindred that would allow the parents to move to semi-supervised visitation if they achieved 90 days of sweat patches testing positive only for THC. By the middle of October 2021, both parents had started semi-supervised visitation, which continued until the end of the year, and then they started unsupervised time. Visits remained unsupervised at the time Bayless transferred the case to Tofflemire.

Once the parents began unsupervised visitation, they continued to try to reach around 20 hours of visitation per week. To develop their co-parenting skills, Bayless left it up to the parents to work together to schedule their visits in light of their work schedules and their various probation obligations. Bayless testified that this effort toward co-parenting was successful and resulted in both parents "attending visits pretty regularly." She testified that their percentage attendance rates during this period were "mostly in the 80s and 90s." Each of the parents had housing, which was approved for visits, and she recalled that visits "went fine" during this period. And, Bayless felt that the parents were "getting better" at redirecting Giovanni's behaviors. She was not aware of any issues occurring during the period of unsupervised visits.

At the time Bayless transferred the case, the Department was concerned that the parents were "still testing positive for THC most of the time." Kylee admitted her THC use to Bayless; Juellian denied using and "wasn't sure why . . . his patches were positive." Bayless testified that other than the continued drug use, the parents were "overall doing pretty good." She felt like "some

good progress" was made during her supervision of the case. Because the parents "were progressing," in January 2022, Bayless requested an exception from the statutory requirement that the Department seek termination when the children have been out of the home for 15 out of the most recent 22 months, which exception was granted.

### (iii) February 2022 Through Termination Proceedings

The Department's concerns when Tofflemire was assigned the case included substance abuse, household relationships, domestic violences, resource management, mental health, coping skills, and parenting skills. During this period, the Department continued to work collaboratively with Probation to ensure that the parents were provided various resources and programming, including drug patch testing. With respect to sweat patch results, Tofflemire noted the positive fentanyl sweat patch for Juellian on October 18, 2022, and "a positive UA result" for Kylee "within recent months (Tofflemire was unsure of the date). Tofflemire also noted Juellian's counseling with the programs he attended through Probation. She testified that both parents had completed "Circle of Security." Tofflemire noted that Kylee had not been participating in the women's trauma group as ordered by Probation.

Tofflemire testified that both parents had struggled to maintain stable housing and employment throughout the case. At the time of her testimony, Juellian had had stable housing "for the most recent months;" Kylee was still "homeless" after having been evicted from her residence in October 2022. To Tofflemire's knowledge, Juellian was currently employed, but Kylee had struggled with employment in recent months.

Tofflemire indicated that when she took over the case, the parents were transitioning to unsupervised visits. Overnight visits for Kylee were added near the beginning of June after she received five consecutive negative sweat patch results. Juellian's visits reverted to fully supervised at a visitation center in April 2022 after concerns about fentanyl use. Tofflemire noted that Juellian received a sanction through Probation, and after his jail time, he had a drug test that was positive for fentanyl. Tofflemire testified that the same test was sent to two separate labs and confirmed to be positive for fentanyl.

By June 2022, Juellian's visits were semi-supervised; Kylee's visits were unsupervised "and then semi-supervised with the addition of overnight visits." However, Kylee's visitation changed with her arrest on July 7, after the discovery of "fentanyl, liquid PCP and meth" in her residence. After that, visits returned to fully supervised in a visitation center for Kylee. Tofflemire believed Juellian's visits were fully supervised at that time as well.

Kylee attended 4 out of 5 visits offered to her in July 2022. During August, Kylee attended 9 out of 21 fully supervised visits. She was at least 10 minutes late to 7 of the visits she attended. When visits did occur, Kylee exhibited a positive and strong bond with the children, but she struggled to set boundaries and follow through when setting expectations. In July there was a slight decline in the quantity and quality of Juellian's visits. Juellian attended 15 out of 20 visits offered in July. Two missed visits were due to him traveling out of town, which he had communicated to the Department and Probation. He attended 13 of 20 visits offered to him in August; 5 of the 7 missed visits were due to his incarceration for his probation sanction. Family support also noted a strong bond between Juellian and the children and that he did a good job of redirecting them as necessary.

At the time of the termination hearing, Juellian was receiving 11 hours of supervised visitation per week at a visitation center. Tofflemire testified that the Department would want to see 3 or 4 more consecutive negative drug tests before moving the children back into the home. The Department would also want to see a deep cleaning to ensure there was no residual risk of the children being exposed to fentanyl.

As to the parents' relationship, Tofflemire testified that both parents told her they were "strictly co-parenting," but she had concerns that "that is not the full truth." She noted that Juellian's vehicle had been seen at Kylee's residence on the day of her arrest, and when Tofflemire inquired, she received differing stories about their level of involvement. She testified that her perception was that "they might be involved more than for co-parenting purposes." Tofflemire noted the parents' blaming one another for positive drug tests at various points during the case. She also noted allegations that Juellian was responsible for damage to Kylee's vehicle or that Kylee "had [Juellian] jumped."

Tofflemire noted barriers to reunification included the parents' inability to demonstrate sustainable behavioral changes. She also noted Kylee's failure to obtain a mental health evaluation. Tofflemire testified that the Department agreed with the recommendation of termination of Kylee's parental rights from the most recent reunification assessment performed. She noted the length of time the children had been out of the home, the lack of overall sustained behavioral change, the recent substance abuse, and Kylee's current criminal charges and incarceration. The Department also agreed with the recommendation of termination of Juellian's parental rights.

Haley Alvaredo, a family support worker who supervised visitation during the time Tofflemire managed the case also testified about her observations during this period. Alvaredo began supervising Juellian's visits with the children in July 2022. The visits had been taking place in Juellian's residence but had been moved to a visitation center within the previous week. During Alvaredo's time on the case, Juellian had consistently received a total of 11 hours of visitation per week (usually one 3-hour visit, and four 2-hour visits). There had been six missed visits (one due to COVID-19, a couple when Juellian was incarcerated for a drug court sanction, one when he was out of town, and one cancelled without explanation).

Alvaredo indicated that Juellian's visits have gone well. She testified that he actively engages and interacts with the children during the entire visit, that he encourages their creativity while playing with them, and that he also attends to their physical and emotional needs during visits. Alvaredo had not had any concerns during the time she supervised Juellian's visits, and she testified that the children had "a very good bond" with him. Juellian had always been on time for visits and had been cooperative and communicative with Alvaredo. She agreed that positive drug tests were a concern because of the possible impact of drug use on his parenting and the potential for "drug exposure."

Alvaredo supervised Kylee's visits from July 2022 until Kylee's recent incarceration. Initially, Kylee was also receiving 11 hours of visitation per week, but Alvaredo testified that "within about the month of some inconsistency," the frequency was dropped to 6 hours per week. Alvaredo observed that Kylee interacted "very well" with the children and testified that they "definitely had a strong bond" and were "excited" to see one another. She described Kylee as engaged and interactive during the visits and testified that Kylee attended to the children's needs. In addition to providing comfort, Kylee would provide snacks and meals for the children. During

Alvaredo's supervision, Kylee cancelled 16 visits, and there were 3 "no-shows." Kylee was late for 10 out of the 14 visits she attended. However, Alvaredo thought that Kylee "showed strengths" in her parenting and that she "was trying."

### 3. ORDER TERMINATING PARENTAL RIGHTS

On January 25, 2023, the juvenile court entered an order terminating Kylee's and Juellian's parental rights. The court found clearing and convincing evidence that termination was proper pursuant to § 43-292 (2), (4), (6), and (7) and that termination of Kylee's and Juellian's parental rights was in the children's best interests.

## III. ASSIGNMENTS OF ERROR

Kylee assigns, restated, that the juvenile court erred in (1) finding the State established statutory grounds for termination under § 43-292(2), (4), and (6) by clear and convincing evidence, and (2) finding that termination of her parental rights was in the children's best interests.

Juellian cross-appealed, assigning, restated, that the juvenile court erred in (1) finding sufficient evidence for termination under § 43-292(2), (4), (6), and (7), and (2) finding that termination of his parental rights was in the children's best interests. We note that Juellian failed to comply with the rules regarding cross-appeals; although he clearly noted his cross-appeal on the cover of his brief, he did not set forth his cross-appeal in a separate section as required by Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2022). However, because Juellian's brief complies with the rules regarding an appellant's brief and does not take issue with any errors asserted by Kylee, in our discretion, we treat his brief as a brief on cross-appeal. See *id.*

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D., Jr.*, 314 Neb. 631, 992 N.W.2d 471 (2023). When the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

### 1. STATUTORY GROUNDS

Kylee and Juellian both assert that the juvenile court erred in finding that their minor child came within the meaning of § 43-292(2), (4), and (6). Juellian also challenges the court's finding with respect to § 43-292(7). Upon our de novo review, we find that the State presented clear and convincing evidence to support termination of Kylee's and Juellian's parental rights under § 43-292(7). Proof of one statutory ground is needed for termination, and the record clearly shows that statutory grounds for termination of his parental rights exist under § 43-292(7).

Section 43-292(7) provides grounds for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

The children were removed from Kylee's and Juellian's care and placed in the Department's custody on October 8, 2020, and have been in out-of-home placement continuously since that time. Motions to terminate Kylee's and Juellian's parental rights were filed on August 31, 2022, at which time the children had been in out-of-home placement for 22 months, and by the start of the termination hearing on November 30, they had been in out-of-home placement for over 25 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Kylee's and Juellian's parental rights under § 43-292(7) were proven by sufficient evidence.

The juvenile court also found sufficient evidence to support termination under § 43-292(2), (4), and (6), but we do not need to consider whether termination of Kylee's and Juellian's parental rights was proper pursuant to those subsections since § 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). However, we will consider evidence relevant to § 43-292(2), (4), and (6) in our analysis of best interests. Generally, when termination of parental rights is sought, the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re Interest of J'Endlessly F. et al.*, 26 Neb. App. 497, 920 N.W.2d 858 (2018).

2. BEST INTERESTS AND UNFITNESS

Kylee and Juellian assert that the juvenile court erred in determining that termination of their parental rights was in the children's best interests. Kylee argues that although she struggled with drug addiction during this case, the children knew who their parents were, the parents made positive strides in working with Hald, and she notes evidence of a strong bond between her and the children. Juellian notes his "fairly good contact with the children," the positive nature of the visits, and the "good relationship and loving bond" between him and the children. Brief for appellant at 17. He argues that the State failed to produce evidence that termination of his parental rights was "the only viable and reasonable alternative" in this case. *Id.*

In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Gabriel B.*, 31 Neb. App. 21, 976 N.W.2d 206 (2022). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). In light of the constitutionally protected nature of the parent-child relationship, there is a rebuttable presumption that it is in the child's best interests to share a relationship with his or her parents. *In re Interest of Denzel D., Jr.*, 314 Neb. 631, 992 N.W.2d 471 (2023). The presumption that it is in the child's best interests to share a relationship with his or her parent can only be overcome by a showing that the parent either is unfit to perform the duties imposed by the relationship or has forfeited that right. *Id.* Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a *child's* well-being. *Id.* The best interests and parental unfitness analyses in the context of a termination of parental rights case require separate, fact-intensive inquiries, but each examines essentially the same underlying facts. *Id.*

- 11 -

The evidence shows that Kylee and Juellian have had continued issues with drug use throughout this case despite periods of progress toward sobriety. The possibility of their continued relationship is concerning in light of their failure to address domestic violence issues. In its termination order, the juvenile court particularly noted "the historical evidence" showing that "each parent has ultimately either procrastinated making meaningful and sustained changes and/or prioritized their personal life struggles over the needs of the children." The court also observed, "The chaotic and uncertain nature of the parents' continued personal relationship further complicates the prospects of a safe, stable and healthy home environment for the children." The court concluded that "the totality of the evidence, and especially the lengthy period of time the children have remained in out-of-home placement, collectively dictates in favor of termination of parental rights being in the children's best interests." The court's observations and conclusions are consistent with our de novo review of the record.

Kylee and Juellian clearly love their children and have made progress at various times to comply with their case plan goals, and drug court and probation requirements. However, there has not been consistent progress as the record shows that there have been relapses in drug use, missed visits, and a failure to address domestic violence issues. The parents did not complete child-parent psychotherapy. Neither parent has placed themselves in a position to have the children returned to their care. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jay'Oni W. et al.*, 31 Neb. App. 302, 979 N.W.2d 290 (2022). We conclude that the State showed by clear and convincing evidence that Kylee and Juellian were unfit, and that termination of their parental rights was in their children's best interests.

## VI. CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Kylee's and Juellian's parental rights to their minor children.

AFFIRMED.