IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF MADDISON S. & MATTHEW S.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF MADDISON S. & MATTHEW S., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MATTHEW S., SR., APPELLANT.


Filed September 19, 2023.    No. A-23-154.


Appeal from the Separate Juvenile Court of Lancaster County: SHELLIE D. SABATA, Judge. Affirmed.

Steffanie J. Garner Kotik, of Kotik & McClure Law, for appellant.

Patrick F. Condon, Lancaster County Attorney, and Tara A. Parpart for appellee.


PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

MOORE, Judge.

## INTRODUCTION

Matthew S., Sr. (Matthew Sr.), appeals from an order of the separate juvenile court of Lancaster County, terminating his parental rights to his minor children. The court found that termination of his parental rights was proper under Neb. Rev. Stat. § 43-292(2) and (7) (Reissue 2016) and was in the children's best interests. Upon our de novo review of the record, we affirm.

## STATEMENT OF FACTS

Matthew Sr. and Heather S. are the parents of Matthew S., Jr. (Matthew Jr.), and Maddison S., twins born in January 2018. In June 2019, Heather and Matthew Sr. were living with the children in Colorado. The exact sequence of events is unclear from the record, but at some point they came to Nebraska where Heather has family. Matthew Sr. then went to Kansas and later Ohio,

- 1 -

while Heather and the children continued to reside in Nebraska. Matthew Sr. has been in prison in Ohio since August 2020, following his conviction for robbery. The children were removed from Heather's care on March 21, 2021, and placed in the temporary custody of the Nebraska Department of Health and Human Services. The children have remained in out-of-home placement since that time. During the course of this case, Heather voluntarily relinquished her parental rights to the children, and she is not involved in the present appeal.

On March 22, 2021, the State filed a motion seeking an ex parte order for emergency temporary custody of the children. The affidavit in support of the State's motion indicates that police were dispatched to Heather's residence to investigate possible sexual assault of the children. At the residence, a childcare provider reported seeing bruising on both children and swelling in Maddison's vaginal area. She also informed police of Matthew Jr.'s report that Heather hit and kicked him and Maddison's report of pain in her vaginal area. The caregiver reported being given alcohol and drugs in exchange for caring for the children. Police located drug paraphernalia, including suspected methamphetamine residue, and firearm ammunition in areas of the residence accessible to the children. On March 22, the juvenile court entered an ex parte order for emergency temporary custody and placed the children with the Department.

On March 23, 2021, the State filed a petition in the juvenile court, alleging that the children were juveniles within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). Specifically, the State alleged that the children lacked proper parental care and were at risk of harm due to the faults or habits of Heather because (1) on March 21, controlled substances, drug paraphernalia, and/or alcohol were located within the family residence and/or within reach of the children; (2) on March 21, Heather appeared to be under the influence of drugs and/or alcohol; and (3) on more than one occasion from January 1 to March 21, Heather left the children with inappropriate caretakers and/or caretakers who were unable to adequately care for them. An amended petition, removing the allegation about Heather appearing to be under the influence, was filed on March 4, 2022.

The transcript on appeal includes a letter from Matthew Sr., addressed to "To whom it may concern" and dated April 30, 2021, sent "in response to the summons and papers" he received about the juvenile court case. In the letter, Matthew Sr. explained that he "couldn't make the hearings" due to his incarceration in Ohio, but that he would like his father to have physical custody of the children in Kansas until his release.

On March 7, 2022, the juvenile court entered an order adjudicating the children as juveniles within the meaning of § 43-247(3)(a) with respect to the allegations against Heather in the amended petition.

In a dispositional order entered on April 26, 2022, the juvenile court stated that Matthew Sr. could have professionally supervised telephonic parenting time, once a week, as arranged by the Department. The court entered a similar order following a review hearing in August.

On September 15, 2022, the State filed a supplemental petition in the juvenile court with allegations against Matthew Sr. and a motion seeking to terminate his parental rights. In the petition, the State alleged that the children were juveniles within the meaning of § 43-247(3)(a) due to the fault or habits of Matthew Sr. and were at risk for harm because (1) Matthew Sr. had known that the children were in the Department's temporary custody and in out-of-home placement since at least April 29, 2021, and had failed to place himself in a position to parent

and/or assume custody and care of the children; and (2) had failed or been unable to provide the children with a safe and stable home. In the motion for termination of Matthew Sr.'s parental rights, the State alleged grounds for termination under § 43-292(2) and (7) and that termination of Matthew's Sr.'s parental rights was in the children's best interests.

An adjudication and termination trial was held before the juvenile court on November 28, 2022. Matthew Sr. appeared by video. The court heard testimony from two Department case workers, the children's therapist, and Matthew Sr. The court also received case plans and court reports into evidence and other documents including files from Matthew Sr.'s criminal case.

Matthew Sr. committed a robbery offense involving a firearm in Ohio on September 25, 2019, and has been incarcerated since that time. He was indicted in an Ohio court, and in March 2020, he pled guilty to robbery and was sentenced to imprisonment for 4 to 6 years. The record indicates that his discharge date will be September 10, 2023.

Taileigh Sorensen supervised the Department case worker assigned to the case from February to April 2022 and then served as the Department case worker from April until August 2022. Sorensen testified about the Department's efforts to maintain contact with Matthew Sr. Sorensen indicated that the previous case worker appeared to make efforts to reach out to Matthew Sr. on a monthly basis. During Sorensen's time managing the case, Matthew Sr. called her at least every other week and usually once or twice a week depending on what was going on in the case. She indicated that he would ask about how the case was going and how the children were doing. She was able to have a video visit with Matthew Sr. "once or twice." According to Sorensen, Matthew Sr. was always appropriate with her during their contact and showed appropriate concern for the children's wellbeing. She indicated that he was able to participate in a "team meeting" via video on at least one occasion. Sorensen was unaware of Matthew Sr. having sent letters, providing gifts or financial assistance, or otherwise contacting the children, although she had not checked with the foster parents to see if he had done so. She noted that Matthew Sr. wanted to send letters through the children's therapist, but the therapist had not been approved for contact with Matthew Sr. at the prison during Sorensen's time on the case.

Sorensen testified about her understanding of Matthew Sr.'s plans upon his parole in September 2023. She indicated Matthew Sr. told her he planned to serve his parole at his parent's home in Kansas. Matthew Sr. asked the Department to consider his father as a placement for the children. Sorensen then "completed the ICPC paperwork to start the process" to evaluate an out-of-state placement for the children. When Sorensen checked the Kansas ICPC website the week before trial, there was nothing to indicate yet whether the paperwork had been approved.

Sorensen testified about her discussions with Heather concerning Matthew Sr.'s last in-person contact with the children. Sorensen noted Heather's report that Matthew Sr. had not seen the children since they were approximately 18 months old, when the family was living in Colorado. Heather told Sorensen that Matthew Sr. had "left all of the family's belongings on the corner" before leaving Colorado and going to Ohio.

Matthew Sr. had not had any professionally supervised visits with the children by telephone or video. Sorenson noted that once the children began therapy, therapeutic contact was recommended. She testified that given the length of time since any in-person contact between Matthew Sr. and the children, a period of therapy and therapeutic contact would be best prior to him "having full contact" with them. According to Sorensen, the children's therapist had been

trying to get approved by the correctional facility where Matthew Sr. resided to provide therapeutic contact between Matthew Sr. and the children. Sorensen affirmed that Matthew Sr. made his desire for contact with the children clear to her during her time on the case. She testified that, other than his incarceration, Matthew Sr. did not do anything to impede setting up such visits.

With respect to services provided to Matthew Sr. by the Department, Sorensen testified that "Family Finding[s] was put in place so that he could work on being a part of the team at that point in time." She also noted Matthew Sr.'s report of completing some classes while incarcerated, although she never received any certificates of completion from him. Sorensen testified that given Matthew Sr.'s incarceration, especially in a different state, it was hard to set up any services beyond the monthly Family Findings meetings.

KinDale Andreen, the current Department case worker, was assigned to this case in August 2022. Andreen had contact with Matthew Sr. on October 31, and gave him her contact information at that time, but she indicated that he has not contacted her since then. According to Andreen, Matthew Sr. indicated he had been calling her on a number provided to him by Sorensen, but Andreen did not have any "missed calls" in her call log to indicate that he had been doing so. With respect to the "ICPC process" initiated by Sorensen to seek approval for placement of the children in the home of Matthew Sr.'s father, Andreen received an email the morning of her testimony indicating that approval was denied due to the criminal history of Matthew Sr.'s father. Andreen agreed that it was in the children's best interests to have stability in their lives and to achieve permanency in the near future and that Matthew Sr. would not be able to provide such stability and permanency in the near future. Andreen opined that termination of Matthew Sr.'s parental rights was in the children's best interests, given the length of time since they had had in-person contact with him, how long they have been in foster care, and the time needed for a rehabilitation plan upon Matthew Sr.'s release from prison.

Holly Burns, the children's individual and family therapist, began working with them in December 2021, using child-centered play therapy. She testified that child-centered play therapy is used with children that have trauma and allowed them "to create their trauma narrative from their perspective, which is age appropriate." She described the children's progress in therapy, indicating that the signs of trauma exhibited by the children lessened with continued therapy. Burns responded negatively when asked whether the children had any sort of attachment with Matthew Sr., noting their infrequent telephone or video contact with him after their last physical contact at 18 months old and prior to the start of the juvenile court case. She indicated that "[l]ots and lots of interventions" would be required in order for the children to form a secure attachment with Matthew Sr., including a full psychological evaluation and parenting assessment of Matthew Sr. followed by child parent psychotherapy or parent child interactive therapy, which could last between 18 and 24 months. She noted that the children were beginning to form such attachments with their foster parents and testified that if a child is able to form a secure attachment with one primary caregiver, "those skills then become transferrable." Burns testified further that while the children were working on attachment with the foster parents, it would "just take a lot of intervention" for them to be able to transfer that attachment to Matthew Sr. Burns did note that the foster mother had received approximately four letters from Matthew Sr. for the children, which have been shared with the children and have been kept by the foster parents in "the life book for the children." In addressing the reasons why therapeutic visitation had not been established

between Matthew Sr. and the children, Burns indicated that she had been given forms to fill out for contact with Matthew Sr. at the prison, that she had filled out and sent in her forms twice, but that no one from the facility reached out to her (nor was she ever contacted directly by Matthew Sr.). She also stated that "the children have gone through so much right now with the visitation of [Heather], introducing another person would be very difficult for them as well" and would have to be "well planned out." Burns testified that permanency was vital for the children given the multiple abruptions to their placements (their initial removal from Heather's care followed by placement in two foster homes) and the parents' addiction history and mental health issues.

Matthew Sr. testified about the classes and services he had participated in while incarcerated. He had recently graduated from an electronics and computer repair class and had been "looking into parenting groups," but had not been able to take a parenting class as it had not been "recommended for [him]" when he entered prison. He was also taking a Buddhist correspondence course. Matthew Sr. discussed his plan to live with his father and father's wife in Kansas upon his release, comply with the terms of his probation, and establish a relationship with his children.

Matthew Sr. confirmed that he had not seen the children in person since June 2019. He testified that he and Heather had frequently "been at odds" and indicated that the nature of their relationship limited his contact with the children after June 2019. Matthew Sr. testified that he has had telephone contact with the children during their visits with Heather "maybe a dozen times" since March 2021. He also noted that he has sent cards for the children to their foster placement. According to Matthew Sr., his last telephone contact with the children was in June 2022 and he had most recently sent a card in October. Matthew Sr. described the process involved in setting up contacts for therapeutic visitation in the prison. He indicated that although he sent out the necessary forms and checked frequently to see if Burns had been added to the prison visitation list, "nothing has happened."

Matthew Sr. expressed his willingness to complete any services required prior to having more regular contact with the children. He also expressed his confidence in his ability to provide stability for the children upon his release from prison, indicating he would be setting up employment prior to his release and doing what was necessary to "get [himself] established" and "hit the road running." Matthew Sr. indicated that the only time he had been able to speak with Andreen was in October 2022 when his prison case worker set up a call. He testified that he had been trying to call Andreen once a week since then. He testified that he had also tried the number for Andreen's supervisor as well as the "main office number" for the Department, but that these calls had not been answered or accepted.

On February 15, 2023, the juvenile court entered an order adjudicating the children as juveniles within the meaning of § 43-247(3)(a) with respect to the allegations against Matthew Sr. The court also found by clear and convincing evidence that statutory grounds existed for termination of Matthew Sr.'s parental rights under § 43-292(2) and (7) and that termination of his parental rights was in the children's best interests.

ASSIGNMENT OF ERROR

Matthew Sr. assigns that the juvenile court erred in finding that termination of his parental rights was in his children's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

ANALYSIS

*Statutory Grounds.*

The State sought to terminate Matthew Sr.'s parental rights under § 43-292(2) and (7). The juvenile court found sufficient evidence to terminate on both grounds. Matthew Sr. does not challenge the court's finding of statutory grounds for termination. However, for the sake of completeness, we briefly review the court's findings.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

The children were removed from Heather's care and placed in the Department's custody on March 22, 2021, and have been in out-of-home placement continuously since that time. The supplemental petition and motion to terminate Matthew Sr.'s parental rights was filed on September 15, 2022, at which time the children had been in out-of-home placement for almost 18 months, and by the start of the termination hearing on November 28, they had been in out-of-home placement for over 20 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Matthew Sr.'s parental rights under § 43-292(7) were proven by sufficient evidence.

The juvenile court also found sufficient evidence to support termination under § 43-292(2) but we do not need to consider whether termination of Matthew Sr.'s parental rights was proper pursuant to that subsection since § 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). However, we will consider evidence relevant to § 43-292(2) in our analysis of best interests. Generally, when termination of parental rights is sought, the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re Interest of J'Endlessly F. et al.*, 26 Neb. App. 497, 920 N.W.2d 858 (2018).

*Best Interests and Unfitness.*

Matthew Sr. assigns that the juvenile court erred in finding that termination of his parental rights was in his best interests. He argues that there was no opportunity for him to participate in services to alleviate the need for the children's out-of-home placement, and he notes his contact with the Department, his requests for therapeutic visitation, the letters he sent and his telephone

contact with the children, and the evidence that he would be released from prison in September 2023.

In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Gabriel B.*, 31 Neb. App. 21, 976 N.W.2d 206 (2022). *Id.* In light of the constitutionally protected nature of the parent-child relationship, there is a rebuttable presumption that it is in the child's best interests to share a relationship with his or her parents. *In re Interest of Denzel D., Jr.*, 314 Neb. 631, 992 N.W.2d 471 (2023). The presumption that it is in the child's best interests to share a relationship with his or her parent can only be overcome by a showing that the parent either is unfit to perform the duties imposed by the relationship or has forfeited that right. *Id.* Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a *child's* well-being. *Id.* The best interests and parental unfitness analyses in the context of a termination of parental rights case require separate, fact-intensive inquiries, but each examines essentially the same underlying facts. *Id.*

The record shows that Matthew Sr. has continually expressed his interest in maintaining contact with the children throughout the pendency of this case. He has sent some letters and had telephone contact with them during some of Heather's visits. Matthew Sr. also appears to have maintained regular contact with the Department case workers within the limits of his incarceration. His interactions with them and others involved in this case has been appropriate. However, Matthew Sr.'s tumultuous relationship with Heather and his actions prior to his incarceration took him out of the children's lives when they were only 18 months old, and his commission of a robbery involving a gun in Ohio further limited his ability to form a lasting, stable attachment with them and to provide them with stability and permanency. Although incarceration alone cannot be the sole basis for terminating parental rights, it is a factor to be considered. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). And, although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *Id.* In a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration.

Despite Matthew Sr.'s best intentions for his life upon release from prison, the record shows that his reintroduction into the children's lives would require a lengthy period of therapy and further interventions, as there is presently no bond between Matthew Sr. and the children. Further, Matthew Sr.'s plan to live with his father would limit his ability to regain custody of the children as his father's home has not been approved for placement due to his criminal history. The children need stability and permanency given the trauma they experienced while living with Heather in Nebraska and the length of time they have spent in foster care. It is clear that Matthew Sr. will not be able to provide that stability and permanency for them for quite some time. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jay'Oni W. et al.*, 31 Neb. App. 302, 979 N.W.2d 290 (2022). We conclude that the State showed by clear and convincing evidence that Matthew Sr. was unfit, and that termination of his parental rights was in the children's best interests.

## CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Matthew Sr.'s parental rights to his minor children.

AFFIRMED.