IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF LIAM T.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF LIAM T., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

KRYSTAL T., APPELLANT.

Filed December 3, 2024.    No. A-24-204.

Appeal from the County Court for Johnson County: JEFFREY A. GAERTIG, Judge. Reversed and remanded for further proceedings.

Lawrence G. Whelan, of Whelan Law Office, for appellant.

Benjamin Beethe, Johnson County Attorney, for appellee State of Nebraska.

Zackary E. Carlson, Special Assistant Attorney General, for appellee State of Nebraska Department of Health and Human Services.

Elizabeth D. Ferebee, guardian ad litem.

RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

Krystal T. appeals from an order of the county court for Johnson County, sitting as a juvenile court, terminating her parental rights to her son, Liam T. Upon our de novo review of the record, we conclude that Liam's guardian ad litem failed to prove by clear and convincing evidence that Krystal was an unfit parent and thus, that it was in Liam's best interests to terminate Krystal's

parental rights. We therefore reverse the order of the juvenile court and remand for further proceedings.

## II. STATEMENT OF FACTS

Krystal is the biological mother of Liam, born in September 2013. The identity of Liam's biological father has never been confirmed; thus, we only discuss Liam's alleged father as necessary to the resolution of the current appeal by Krystal.

### 1. PROCEDURAL BACKGROUND

On August 25, 2020, the Johnson County sheriff's office received a call from the Nebraska Child Abuse and Neglect hotline indicating that Krystal had been arrested for possession of methamphetamine. There was concern that Liam, then age 6, who was not present at the time of Krystal's arrest, was being improperly supervised and living in unsanitary conditions. Law enforcement made contact with Liam, who was in the care of Krystal's acquaintance at the family's residence. Upon inspection of the home, law enforcement found it to be in a condition unsuitable for habitation. Law enforcement placed Liam into protective custody, and he was removed from the home.

A petition was filed the following day to adjudicate Liam pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) based on Krystal's arrest, which left Liam in the care of an acquaintance who had informed law enforcement that he no longer wished to watch Liam; that there were fresh and dried dog feces around the home, including close to Liam's bed; that rooms on the main level of the home were stacked with boxes and trash; that the home had insufficient food and Liam had not eaten for several hours; and that Liam was registered as a virtual learner at his school but had been minimally participating in the virtual learning; all of which placed Liam at risk of harm. The officer who removed Liam from the home authored an affidavit detailing his contact with Liam and the condition of the home. Relying on the affidavit, the juvenile court entered an ex parte custody order on August 26, 2020. Liam has remained out of the home since he was removed.

An amended juvenile petition was filed on August 28, 2020, correcting the spelling of Krystal's name but otherwise providing identical allegations to those contained in the original petition. At a first appearance hearing on September 2, the juvenile court ordered that Krystal should have reasonable supervised visitation with Liam and that she should undergo a chemical dependency exam and apply for inpatient treatment.

On March 25, 2021, the juvenile court entered an order adjudicating Liam based on the admissions of Krystal to the allegations in the amended petition. The court entered a dispositional plan for Krystal on May 27, adopting the case plan presented by the Department of Health and Human Services (the Department). Krystal's case plan goals included maintaining a sober lifestyle; working to improve the condition of her home so that it can be maintained long term at a level above minimal standards; and addressing her mental health concerns. The court also ordered the Department to coordinate a parenting assessment for Krystal.

Four review hearings were held on September 8, 2021; January 5, 2022; August 11, 2022; and November 2, 2022. The goals of the court-ordered dispositional plan have been consistent throughout the case.

On September 20, 2022, Liam's guardian ad litem (GAL) filed a supplemental motion for termination of Krystal's and the alleged father's parental rights regarding Liam; alleging statutory grounds to terminate Krystal's rights existed pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016), and the alleged father's rights under § 43-292(1), (2), (6), and (7). An original motion for termination of parental rights does not appear in our record on appeal.

On September 30, 2022, Krystal filed a motion to enforce visitation. The motion alleged that though previous juvenile court orders had awarded Krystal reasonable supervised visitation, she had not had visitation with Liam since March 1, 2022. The motion also alleged that it was in the best interests of Liam that visitation with Krystal resume immediately as previously ordered. On November 1, Krystal filed an amended motion to enforce visitation, which added the allegation that Krystal had completed an updated parenting assessment recommending Parent Child Interactive Therapy (PCIT), and that this service had never been set up by the Department. The amended motion requested that the juvenile court order Krystal's visitation to include family therapy with Dr. Glenda Cottam. A hearing on the matter was held the following day, at which evidence was adduced and the matter was taken under advisement.

On November 10, 2022, the GAL filed an objection to Krystal's motion to enforce visitation. The motion alleged that almost 18 months after Liam's removal, Krystal was arrested and entered residential treatment. During this interruption in visitation, Liam refused to have visits with Krystal despite the Department asking Liam about visitation with Krystal and offering five different forms of visitation. The motion alleged that Liam was evaluated by an individual therapist who did not recommend that any contact occur between Liam and Krystal at the time as such would be detrimental to the possibility of reestablishing a relationship between the two.

In an order filed on January 12, 2023, the juvenile court granted Krystal's amended motion to enforce visitation over the GAL's objection. The court ordered that visitation should immediately resume and continue pursuant to its previous orders and occur on a supervised basis. The court further found that Krystal and Liam should immediately participate in PCIT with Cottam or a suitable substitute medical professional.

On February 14, 2023, the GAL filed a motion to suspend visitation. The motion requested that the juvenile court suspend Krystal's supervised visitation in lieu of family therapy facilitated by Cottam, and alleged that continued visitation would be detrimental to any therapeutic progress. On February 24, Krystal filed a motion for specific visitation, requesting that family therapy continue with Cottam and for Krystal to have supervised visitation once a week beginning in March, with an increase to twice a week in April in the absence of any safety concerns.

A stipulated order by the juvenile court was filed on March 22, 2023, granting Krystal specific visitation according to the timeline requested in her motion, with additional specifications as to location of the visits and transportation.

On March 30, 2023, the Department filed a motion to suspend visitation between Liam and Krystal. In an attached affidavit the family's caseworker, Trisha Babbel, stated that since the supervised visits had resumed, Liam had been agitated and told the visitation worker that he did not want to attend additional visits with his mother. Babbel also stated that the Department had "concerns about the amount of school that Liam is being asked to miss in order to accommodate the desires of adults." Babbel then recounted Liam's travel times in order to attend individual and family therapy. The following day Krystal filed an objection to the Department's motion, stating

that neither therapist had recommended suspending visitation and that Cottam had scheduled additional family therapy sessions.

On April 7, 2023, the Department filed a supplemental motion to suspend visitation. Included was a letter from Liam's individual therapist, Dr. Shelly Benshoof, recommending that contact between Krystal and Liam be suspended and that re-introduction contact occur after Liam had participated in individual therapy services, allowing for him to build the necessary skills and the opportunity to process previous traumatic experiences. The same day Krystal filed an objection, stating that Cottam was not recommending any suspension of visits and that there were no safety concerns.

On April 14, 2023, the juvenile court entered an ex parte order suspending supervised visitation between Krystal and Liam until an evidentiary hearing occurred, as such was in the best interests of Liam.

On April 24, 2023, Krystal filed a motion to substitute the family's caseworker, Trisha Babbel. The motion alleged that Babbel had failed and refused to comply with the juvenile court's orders concerning visitation, failed to reasonably comply with the court's primary objection of reunification, failed to reasonably provide for Liam's individual therapy, and failed to reasonably comply and provide for the best interests of Liam. The same day, Krystal filed a motion for placement, alleging that she was sufficiently rehabilitated, could provide a safe and stable living environment for Liam, and that such was in Liam's best interests.

A hearing was held on the Department's supplemental motion to suspend visitation on April 26, 2023. An order filed the same day in part granted and in part denied the motion. The juvenile court found that supervised visitation between Krystal and Liam should be suspended on an indefinite basis, but that therapeutic visitation facilitated by Cottam in the form of family therapy should continue. The GAL withdrew her February 14 motion to suspend visitation, and Krystal withdrew her February 24 motion for specific visitation.

On May 1, 2023, the Department filed an objection to Krystal's motion for placement change. The objection alleged that Liam had not been in Krystal's care since August 2020; Liam had refused to attend supervised visits with Krystal; the two were not engaged in contact beyond family therapy; and Liam had continuously stated his desire to remain in his current foster home; thus, the requested change of placement was not in Liam's best interests. The same day the GAL filed another objection to a change of placement alleging that Liam appeared to be in distress since the last non-therapeutic visitation was scheduled to occur and requesting that the juvenile court continue Liam's current placement until Krystal and Liam had repaired their relationship. Additionally, Liam's therapist recommended that a change of placement would not be in Liam's best interest.

On August 10, 2023, the Department and the GAL filed a joint motion to temporarily suspend family therapy sessions. Attached to the motion was an affidavit authored by the family's new caseworker, Rob Lippmann, who described Liam's refusal to attend a scheduled family therapy session the prior day. Also on August 10, Krystal filed an objection to the joint motion to temporarily suspend family therapy sessions, again alleging that Cottam had not recommended the suspension of sessions and there were no safety concerns. That same day, the juvenile court entered an order temporarily suspending family therapy sessions between Krystal and Liam.

## 2. TRIAL

The termination trial was held over 3 days in August 2023.

### (a) Removal

Lynn Lyon, Deputy Sheriff for Johnson County, testified that he had gone to Krystal's house to investigate a reported incident of child abuse and neglect. While inside the home Lyon spoke with both Liam and the adult watching him. Photographs Lyon had taken of the home on the day of Liam's removal were received into evidence.

Lyon described Krystal's home as unsanitary with "trash and junk strewn about"; food in a saucepan in the state of spoilage; and both dried and fresh dog feces in areas of the house, including next to Liam's bed; and the smell in the home as "overpowering." Lyon also observed at least seven dogs outside of the home that belonged to Krystal. Lyons removed Liam from the home due to its unsanitary condition and because the adult supervising Liam indicated to Lyons that he no longer wanted to be watching Liam. Lyon was also aware that the adult had a criminal history.

When Lyon was driving Liam to the sheriff's office, Liam expressed that he was hungry. Although a lack of food was also one of the reasons Lyons had removed Liam from the home, he did not open the refrigerator, cupboards, or otherwise see if there was food in the home for Liam. Lyons noted that Liam did not appear malnourished and rather was a "chunky child."

### (b) Krystal's Case Plan and Progress

Babbel testified that she had been the family's Department caseworker from the start of the juvenile case in August 2020 until July 2023. She spoke of the services provided to the family by the Department including family support, supervised visitation, gas vouchers, and referrals for substance abuse and mental health evaluations. During Babbel's time as the family's caseworker, Krystal had completed all of her case plan goals.

### (i) Sober Lifestyle

Babbel testified that Krystal had completed a substance abuse evaluation in September 2020. The evaluation recommended that Krystal participate in intensive outpatient treatment (IOP). Subsequently, Krystal planned to participate in IOP and the Department provided gas vouchers for her travel to treatment each week. In December 2020, the IOP provider reported to Babbel that Krystal had not attended any IOP sessions beyond the first two and that Krystal would now be required to complete a new assessment for any services to resume.

Krystal also began drug testing in September 2020 and stopped testing through the Department in February 2022, though there had been "several starts and stops due to compliance." While Krystal's referral by the Department included two to three tests a week, Babbel testified that Krystal was not consistent in her testing. A review of the Department's case plans reflected that during Krystal's testing period, she typically tested negative but would also produce positive results (alcohol, marijuana, and methamphetamine), as well as fail to attend her drug tests at times.

During the case, there were suspicions that Krystal may be cheating on her drug tests. On August 9, 2021, Babbel was provided with a screen shot of a text message that Krystal allegedly sent in July, inquiring if the recipient of the text message could provide urine for Krystal to

substitute for her own during drug testing. At that time Babbel requested that the services provider begin utilizing a tamper-proof receptacle for Krystal's drug tests.

One month later, Krystal was stopped enroute to a review hearing for driving erratically. During the stop, law enforcement determined that Krystal was under the influence and was in possession of methamphetamine and paraphernalia. Krystal was arrested, and it was discovered that she was also in possession of a bottle of urine that she admitted she was planning to use to falsify the results of a drug test. Krystal was later bonded out by her mother. At that time, Krystal told Babbel that she had been utilizing the urine of other individuals for some time to hide her continued use of methamphetamine.

Krystal began to drug test using sweat patches on October 1, 2021, however Krystal tampered with the sweat patches each week. As a result of Krystal's noncompliance, Babbel requested that drug testing be conducted through mouth swabs.

On November 9, 2021, Krystal had a new substance use evaluation completed. The provider later called Babbel to report that she strongly suspected Krystal was under the influence during the time of her evaluation. The provider recommended IOP but told Babbel that if Krystal were to test positive for substances at any time, the recommendation would be updated to residential treatment. During this time Krystal had reengaged with IOP and was consistent with her attendance.

Though Krystal had applied for admission into drug court following her arrest in September 2021, she was not accepted into the program until January 2022. Krystal's substance abuse evaluation was updated on February 15, after she tested positive for methamphetamine on February 11, recommending residential treatment. On February 28, law enforcement found methamphetamine residue in Krystal's bedroom and the following day Krystal again tested positive for methamphetamine. On March 2, Krystal was brought before drug court and her bond was revoked due to her infractions. Krystal was incarcerated until she could be admitted into residential treatment.

Krystal went to the Stephen Center on March 15, 2022, for residential substance treatment. After Krystal completed residential programming, which included both individual and group therapy, she stayed at the Stephen Center to participate in IOP programming. Krystal was successfully discharged from the Stephen Center on July 28. Babbel agreed that Krystal has maintained a sober lifestyle since she entered the Stephen Center in March 2022.

Chelsea Hagedorn, a probation officer, testified that she had been supervising Krystal in drug court since January 2023. At the time of trial, Krystal was completing phase four out of the five phases of drug court and was eligible to begin the final phase a month later. During phase two, Krystal completed 50 hours of community service required for graduation. Hagedorn reported that it was rare for a participant to complete the community service requirement so quickly. Hagedorn expected Krystal to graduate from the drug court program in December 2023.

Hagedorn testified that she had personally collected drug tests from Krystal and that drug tests through the program are typically randomly administered twice a week. Krystal had submitted 120 drug tests since entering drug court and never tested positive.

At the time of trial, Krystal lived in a two-bedroom apartment, which Hagedorn described as clean and appropriate with no safety concerns. Krystal has been working at a hotel, beginning part time in November 2022 and moving to full time in April 2023. Hagedorn reported that Krystal

was always on time to work and there had been no attendance or behavioral concerns by her employer. Krystal received a work promotion a month prior to trial.

As part of drug court, Krystal completed a 13-week moral recognition therapy program; a cognitive-behavioral treatment that aims to reduce the likelihood of criminal behavior and substance abuse. Krystal had also completed an 8-week relapse prevention class and was presently participating in a group facilitated by probation officers which meets after drug court each month. Krystal was required to attend two support group meetings each week and Hagedorn testified that she typically attends at least four meetings a week.

Hagedorn described Krystal as an excellent communicator who texts or calls Hagedorn with updates and questions. Krystal has never missed a drug test or a meeting. Additionally, Krystal never received a sanction, which Hagedorn testified is rare for drug court participants. Hagedorn noted that Krystal has "been doing exceptionally well." Krystal told Hagedorn that her biggest goals are to graduate from drug court, maintain her sobriety, and reunify with Liam.

*(ii) Condition of Home*

Krystal's home at the time of removal included a large amount of clutter, old and new animal feces on the floor, and a non-functional kitchen and bathtub. Early in the case, Krystal struggled to find the motivation to remedy the condition of the home, but she put forth some effort once Babbel told Krystal that she would be allowed to have in-home visits with Liam once the condition of the residence rose above minimum standards.

Improvements to the home increased in February 2021 when Krystal accepted the assistance of her family support worker, Robin LaPage. LaPage testified that Krystal worked to establish cleaning priorities and learned how to maintain cleanliness in the home. LaPage recalled that Krystal initially owned five dogs who often urinated and defecated in the home. Krystal was resistant to discussions regarding downsizing the number of dogs she owned despite LaPage stating that the dogs were a barrier to returning Liam home.

LaPage testified that at some point the home was clean enough to have supervised visitation on the main floor. However, LaPage stated that though Krystal made some progress in cleaning the home, she did not clean the home to the extent that it would be safe for Liam to live there.

LaPage described Krystal as generally easy to engage with and receptive to change. Krystal did not consistently keep her appointments with LaPage and would frequently cancel. LaPage stopped being Krystal's family support worker when she was arrested in the fall of 2021.

Krystal made statements to Babbel that she did not find family support helpful, though Babbel believed the additional support was necessary to completely rectify the condition of the home. Babbel offered additional assistance in helping Krystal clean her home including that the Department would pay for a dumpster to be delivered to the home as well as other Department workers would come over to the home and help Krystal with physical labor. Krystal declined the assistance offered by Babbel and Krystal did not complete the cleaning of the home.

Krystal moved out of the home in the fall of 2021 and into her aunt's apartment. From there she entered treatment at the Stephen Center and later, moved into a sober living house for 3 months. Since November 2022, Krystal has rented her own two-bedroom apartment. Babbel has been to Krystal's apartment, found it to be appropriate, and did not have any safety concerns.

*(iii) Mental Health Concerns*

Krystal completed an initial diagnostic interview (IDI) in February 2021 after missing her scheduled IDI in January. The IDI was not received by the Department until April and recommended that Krystal complete a full psychological assessment with a substance use component and a parenting assessment with observation.

Krystal completed a psychological evaluation and parenting assessment with Liam in July 2021. The evaluation recommended individual psychotherapy, engagement in outpatient substance use treatment, and parenting coaching. The Department's September 2021 case plan stated that Krystal was "proactive" in initiating individual therapy as well as PCIT, a specific type of family therapy. However, because the PCIT provider only had openings during the school day, Babbel asked that Krystal and Liam be placed on the wait list for the first available late afternoon or evening appointment, with first availability anticipated in November. Babbel testified that Krystal was arrested shortly after the family was placed on the wait list and due to Krystal's unavailability, she and Liam missed the opening to participate in PCIT.

Krystal completed a second psychological evaluation and parenting assessment, this time without Liam, in November 2022. As discussed in greater detail below, Krystal and Liam did not have contact during the majority of 2022. The evaluation recommended family therapy due to the extended period Krystal and Liam spent apart from one another in order to help renew and repair their relationship. The evaluation indicated that Krystal had reported many of her mental health symptoms had stabilized over the last year with continued sobriety. The evaluation did not note any parenting concerns regarding Krystal.

Babbel testified that despite receiving the recommendation from the second evaluation, she did not take any specific action to set up family therapy. Babbel agreed that it took Krystal petitioning the juvenile court for therapeutic visits and the court ordering PCIT for the service to be set up.

Babbel testified that Krystal had regularly attended individual therapy for most of the case.

(c) Liam's Placement

Liam has been placed with Krystal's mother, Sandra T., since his removal. Sandra reported that Liam has done well over the 3 years he has been in her care. Sandra testified that Krystal had not taken an interest in making educational or medical decisions for Liam while he has been in Sandra's care.

Sandra testified that she wanted Krystal to succeed and had supported her financially prior to and after Liam's removal but had ceased her support after Krystal was arrested in September 2021. Sandra did not believe that Krystal was sober and thought that Krystal likely continued to use substances. Sandra was unaware that Krystal was doing well in drug court.

At the time of trial, Sandra and Krystal did not have any contact and Sandra testified that their relationship was beyond the point of repair. Sandra would not participate in counseling with Krystal even if it would be beneficial to Liam. Sandra stated that there was nothing that Krystal could do to make Sandra feel comfortable with her having contact with Liam.

Babbel testified that the relationship between Krystal and Sandra was so strained that Sandra did not want to speak to Krystal after Krystal's bond was revoked and she entered the Stephen Center. Babbel made no effort to improve their relationship, noting that their issues were

not so severe as to compel a placement change. Babbel testified that the Department's priority is placing a child with family, and Liam was content with his placement with Sandra. Babbel did not believe the conflict between Krystal and Sandra was the "highest priority to be addressed."

(d) Visitation and Relationship With Liam

Visits between Krystal and Liam have remained fully supervised throughout the case, as Babbel did not feel that Krystal could maintain appropriate behavior with Liam without full supervision.

Initially, Sandra supervised the visits to allow for an informal, home-like setting. Sandra testified that there were occasions when Krystal would miss visits, show up to visits under the influence of drugs, and have visits where she did not engage with Liam. Sandra stopped supervising visits after roughly 1 month. Thereafter, the Department retained an outside visitation worker who supervised the visits in Krystal's home, the homes of Krystal's family members, and in the community.

Sandra testified that when Liam began attending visits supervised by a worker, he would exhibit aggressive behavior and throw "temper tantrums" upon returning home. However, once Liam adjusted to the visits, he did not exhibit any behavioral issues.

Beginning in late 2021, Liam began expressing to Babbel his desire to stay in Sandra's care. Babbel recounted a time she supervised a visit in December 2021. Liam was trying to have a conversation with Krystal about his not wanting to return to her home and wanting to stay with his grandmother. Krystal did not respond to what Liam was trying to tell her and instead steered the conversation toward her plans to buy a home in the country. Babbel was concerned that Krystal asked Liam if he wanted to live with her in this "hypothetical, future home in an ideal setting," rather than engaging in Liam's self-described hurt and fear. Babbel was also concerned that Krystal was making promises that she would not be able to follow through on. Babbel testified that because children have so much faith in the promises by adults, when promises are not kept, it can be devastating and traumatic to the children.

Babbel testified that Krystal struggled to be consistent in her visitation attendance until she entered residential treatment at the Stephen Center. Until this time, Liam was cooperative in attending visits. When Krystal was allowed to start having visits again per the rules of the Stephen Center, Krystal requested visitation with Liam. Babbel brought Liam from his placement in Tecumseh, Nebraska, to the Stephen Center in Omaha, Nebraska, but Liam did not want to see Krystal.

Babbel testified that she encouraged Liam to attend visits with Krystal and offered different forms of visitation to alleviate his fears. Babbel offered Liam visits with Krystal in Omaha at the children's museum and the zoo and suggested that later visits could be back at Tecumseh in places familiar to Liam. Babbel also offered phone visits and virtual visits by videoconference. Liam was not interested in any of these options. Babbel also discussed Krystal's progress at and after the Stephen Center with Liam. Babbel testified that none of this changed Liam's feeling about visits with Krystal.

Sandra testified that in the spring of 2022, Liam did not want to attend visits with Krystal and would scream and stomp his feet when it was time to be transported to a visit. Sandra also

stated that after Krystal's bond was revoked, Liam seemed happier overall. Sandra neither encouraged nor discouraged Liam to attend visits with Krystal because "that was his choice."

Though Krystal communicated to Babbel that she wanted to have visits with Liam while at the Stephen Center, Babbel did not schedule any visits or retain a provider because Liam "so adamantly refused to participate." Babbel testified that she discussed Liam refusing visits with Krystal who, though sad, did not want Babbel to force him to attend visits and agreed to give Liam some space to hopefully come back around.

In the fall of 2022, Krystal sought to enforce visitation though Liam was still not wanting to attend. Babbel did not schedule any visits in the fall of 2022 and did not force Liam to attend the visits. Because Liam did not want to participate in visits with Krystal at the Stephen Center, Babbel believed that Krystal and Liam should first participate in PCIT before resuming visitation. However, Babbel did not realize that there would be such a large gap of time between the last visit and any sort of therapy. Babbel testified that Liam never became more comfortable with the idea of visitation with Krystal but that she continued to follow up with him regarding the possibility that visits would resume monthly initially and then weekly by the spring of 2023.

After Krystal motioned the juvenile court to resume visitation with Liam, Krystal and Liam started to have therapeutic visits in the form of family therapy facilitated by Cottam in February 2023. Babbel testified that Liam was initially compliant with the therapeutic visits.

In March 2023, the Department added one supervised visit a week outside of the therapeutic visits. At the first supervised visit on March 14, Liam agreed to visit with Krystal at her father's home and out for a meal. However, Liam's behavior on this visit was uncharacteristically rude and aggressive. Babbel testified that Liam would not follow directions, was throwing items, and at one point, hit his head against a brick wall.

Another non-therapeutic supervised visit was attempted on March 21, 2023, though Liam refused to attend the visit, and it did not occur. No other supervised visits outside of family therapy have since occurred.

LaPage, who was the family's transportation and visitation worker in 2023, testified that Liam flatly refused to attend the March 21 visit and stated several reasons why he did not want to want to go. He was also physically agitated and aggressive, which LaPage testified was abnormal behavior for Liam. LaPage testified that if a child refuses to go to visitation, LaPage generally reassures them that they are safe and tries to keep her demeanor positive. LaPage stated that she cannot force a child to go to a visit and that there are rules that a visitation worker cannot put hands on the child, force the child into a vehicle, or bribe the child in any way.

Babbel agreed that ultimately it was up to Liam whether he had to attend visitation with Krystal or not. Babbel explained to Liam that the visits were court-ordered and explained that this was what the juvenile court wanted him to do but noted that she could not force a child to attend a visit. She confirmed that it was against Department policy for a caseworker to put hands on a child and force him into a car.

Babbel provided transportation for Liam to attend family therapy in the summer of 2023. During the transportation Liam went from being subdued and quiet to increasingly agitated and angry. Babbel testified that Liam only spoke sharply to her when they were discussing visits with Krystal.

Babbel encouraged Liam to attend both supervised visits and family therapy. After collaborating with Benshoof, Liam's individual therapist, Babbel suggested to Krystal that Liam have a "cooling off" period of 30 days after which time Babbel would reapproach Liam about visitation and ask under what terms he would be comfortable having contact. Krystal was not agreeable to Babbel's suggestion.

Babbel testified that Krystal made minimal effort to be involved in Liam's life outside of her visitation with him. During her time as the family's caseworker, Babbel informed Krystal that Krystal's educational rights were intact and instructed her to contact Liam's school. Babbel was not aware that Krystal participated in any parent-teacher conferences, made educational decisions regarding Liam, or attended any of his extracurricular activities.

Babbel was asked if she believed it would be in Liam's best interests to terminate Krystal's parental rights. Krystal objected as to foundation and relevance, as Babbel had not had contact with the family since July 2023. The juvenile court sustained Krystal's objections.

Rob Lippmann testified that he had been Liam's caseworker since July 14, 2023. Lippmann testified that since he has been the caseworker, the only contact between Krystal and Liam was family therapy and that Liam had not been compliant in attending the therapeutic visits. As an example, Lippman discussed a time he transported Liam to family therapy in July 2023. When the car pulled into the parking lot of Cottam's office, Liam hid beneath the seat of the car and told Lippmann that he did not want to go to therapy. However, Liam's demeanor changed once he realized that Krystal had brought Liam's dog.

On August 9, 2023, Liam refused to get into Lippmann's car to be transported to family therapy. When Lippmann arrived at Sandra's home to provide transportation, Liam hid behind Sandra. Lippmann described Liam as "fearful." Lippmann did not force Liam to attend the therapeutic visit as Lippmann believed doing so would have been traumatic for Liam. Lippmann agreed that Liam's behavior at the July therapeutic visit versus the August visit was very different. Lippmann also testified that Liam does not resist attending individual therapy as he does family therapy and that he seems more comfortable with the former.

When Lippmann was asked about best interests, Krystal again objected as to foundation, arguing that Lippmann did not have sufficient knowledge to provide an opinion on the matter. The juvenile court overruled Krystal's objection because Lippmann was the family's current caseworker.

Lippmann testified that termination would be in Liam's best interests. However, Lippmann noted that he had only met Krystal once for 10 minutes on July 19, 2023. He had not yet done a home visit or spoken with Krystal's probation officer or individual therapist. Lippmann had spoken with Cottam, but the two had not discussed Liam's best interests regarding the termination of Krystal's parental rights. Lippmann also did not speak with Cottam or Benshoof prior to filing a motion to suspend therapeutic visits.

(e) Liam's Individual Therapy

Babbel testified that she did not seek out any sort of therapy for Liam during the first 2 years of the case because he was acting appropriately and not otherwise exhibiting any forms of distress. However, Babbel determined in the fall of 2022 that Liam's mental health had declined, and she found a clinician, Benshoof, who could provide him with individual therapy.

Benshoof, a licensed clinical psychologist, described Liam as playful and happy, though he presents approximately 1 to 2 years behind his chronological age in a clinical setting. Benshoof testified that Liam seems satisfied with his current living situation and that he feels safe and comfortable with Sandra.

Liam completed an IDI with Benshoof in October 2022. Benshoof acknowledged that she did not review any collateral information when completing the IDI, such as the Department case plans, Liam's school or medical records, or any of Krystal's psychological or parenting assessments. Benshoof noted that the collateral information was not necessary to formulate a diagnosis or treatment plan. Statements made by Liam to Benshoof during his IDI indicate that Liam believed Krystal would continue using substances and that she was not doing well in drug court.

At the conclusion of the IDI, Benshoof recommended the completion of a diagnostic assessment, primarily to evaluate whether Liam had attention deficit hyperactivity disorder and to gather additional information regarding Liam's trauma history. Benshoof received a diagnostic assessment back from Liam's "home" but not from his school, so the assessment was ultimately incomplete.

Based on the information collected from Liam and Babbel, as well as Benshoof's own observations of Liam, Benshoof diagnosed Liam with post-traumatic stress disorder (PTSD). Benshoof testified that she diagnosed Liam with PTSD based on Liam's disclosures that he had inadequate supervision, lack of access to adequate food, and that the adults in the household were often unavailable to him. Benshoof described a trauma of omission as an absence, denial, or removal of something that is essential to human health and development and noted that the trauma experienced by Liam would be considered a trauma of omission.

Following a delay in receiving information back from Liam's school, Benshoof recommended starting therapy services for Liam. Benshoof began seeing Liam for regular individual therapy sessions in January 2023. However, due to cancellations by both Benshoof and Babbel, the second therapy session did not occur until March. Benshoof and Liam have worked on raising Liam's awareness regarding his feelings, thoughts, and bodily sensations, as those are often suppressed in children with PTSD. Through this greater awareness, Liam has been able to learn coping skills that have helped him be less reactive. Benshoof has also educated Liam on what an addiction is and helped him understand what in his early life was attributable to Krystal's addiction.

Benshoof testified that Liam avoids or has a reaction to stimuli which remind him of his traumas. Benshoof noticed that Liam's reactions became more intense in the spring of 2023 as compared to the prior fall. Benshoof also noticed additional disruptive behavior, noncompliance, and regression of Liam's communicative abilities. Benshoof testified that Liam has been showing clinically significant distress particularly around the topics of Krystal and the juvenile court case.

Benshoof recommended that Liam continue participating in individual therapy to treat his PTSD but didn't believe that family therapy would be helpful at the time of trial. Benshoof testified that Liam has not yet processed his previous traumatic experiences, which impacts his ability to successfully move forward in rebuilding and establishing a positive connection with Krystal. Benshoof also believed that if Liam were to continue with family therapy, it may be detrimental

to his relationship with Krystal. A change of placement would also be disruptive to Liam's treatment.

Benshoof did not believe that Liam would be ready to be placed with Krystal in the near future. Liam has shared with Benshoof several times that he does not want to be in Krystal's presence. Benshoof was concerned that if Liam was forced to have contact with Krystal outside of supervised and limited visitation, Benshoof would expect Liam to react similarly to how he had in the spring of 2023 when he exhibited disruptive behavior, aggression, emotional dysregulation, and communication regression. However, in the spring of 2023, Liam also moved with Sandra to a new home. Benshoof acknowledged that this could have been a factor that created some anxiety and frustration for Liam. A review of Benshoof's progress notes reflect that Liam did not report anything negative to her about family therapy sessions.

Benshoof did not testify as to whether termination would be in Liam's best interests, but when asked whether Liam would benefit from permanency, Krystal made a foundational objection and stated that the questioning was "getting to the ultimate issue for the Court to decide." The juvenile court sustained the objection.

Benshoof did not consult with Cottam regarding her recommendation to suspend contact between Krystal and Liam. Benshoof also acknowledged that she made the recommendation after having only three individual therapy sessions with Liam.

### (f) Family Therapy

Cottam, a licensed clinical psychologist, provided family therapy for Krystal and Liam beginning in February 2023. Prior to starting family therapy, Cottam met individually with Liam, Krystal, and Sandra, as well as reviewed collateral information including Department case plans, visitation notes, Krystal's and Liam's respective therapy records, Krystal's substance abuse and parenting assessments, a discharge summary from the Stephen Center, and information from Krystal's drug court case. At the time of trial, Cottam had facilitated 17 family therapy sessions between Krystal and Liam.

Cottam had reviewed the IDI completed by Benshoof and testified that based on the contents contained within the IDI, she would not have diagnosed Liam with PTSD but rather "would want more information." Cottam discussed the collateral information and other assessments she would have utilized prior to giving Liam a PTSD diagnosis.

Cottam testified about positive moments between Krystal and Liam, such as Krystal bringing Liam's dog and a LEGO set to sessions to keep Liam engaged, and Liam being physically close to Krystal and touching her hair. Krystal asks Liam appropriate questions and engages with him about the happenings in his life. At times Liam needs to be redirected, and though Krystal points out Liam's inappropriate behavior, Cottam observed Krystal's uncertainty regarding how to enforce consequences if Liam does not follow her redirection.

In their sessions, Krystal and Liam had progressed to talking about serious issues such as Krystal's substance use. Krystal gave Liam her chip commemorating her 1 year of sobriety when he asked for it. Krystal also purchased the children's book Benshoof was using to talk with Liam about substance abuse and addiction and brought it with her to family therapy. Cottam testified that Liam remains very concerned that Krystal will relapse as he has perceived that individuals with an addiction never recover.

Cottam believed that the condition of Krystal's home may be one of the reasons why Liam has repeatedly articulated to both Krystal and Cottam that he likes living with Sandra. In June 2023, Krystal and Liam were discussing Liam visiting Krystal and potentially staying overnight. Liam stated that he wanted to be sure Krystal had enough food but that staying overnight "might be kind of fun." Krystal and Liam discussed the possibility of making pizzas and having a pillow fight. Cottam stated that Liam did not articulate fear when discussing the topic and did not appear in any way uncomfortable.

Cottam stated that Liam seemed open to additional contact with Krystal but acknowledged that some visits were canceled because of Liam's unwillingness to go. A review of Cottam's progress notes demonstrates that beginning in June 2023, after Liam would be transported to Cottam's office, he would refuse to exit the car. Cottam and Krystal would then come out of Cottam's office and speak with Liam from the outside of the car until he agreed to participate in family therapy. Cottam testified that though Liam initially had difficulty getting out of the car upon arrival at her office in the summer of 2023, after he interacted with Krystal, he seemed playful and relaxed. Cottam stated that Liam usually listens to Krystal and was "certainly not afraid of her."

Cottam believed that Liam had a difficult time getting out of the car upon his arrival to her office because Liam was under the impression that he does not have to get out of the car or go into Cottam's office. Cottam was unsure whether Liam came up with this principle on his own or through another source. When Cottam told a transportation worker that Liam was ordered to be active in therapy, the worker responded that Liam was just ordered to come to the office. Cottam believed this was said within Liam's hearing range and Liam could have misinterpreted the statement to mean that he did not have to go inside Cottam's office. The progress notes demonstrate that in August 2023, Liam began refusing to be transported to family therapy entirely.

In discussing barriers to family therapy, Cottam noted the dynamic between Liam and Sandra. Liam loves Sandra, has spoken highly of her, and has repeatedly indicated that he wants to continue to live with her. When Cottam met with Sandra, Sandra "seemed so heartbroken and upset and angry about her daughter's history of poor choices and substance use."

Cottam testified that she has a negative perception of the relationship between Krystal and Sandra. Cottam had recommended that Krystal and Sandra attend counseling or mediation to allow for Krystal to share more about her sobriety and rehabilitation so that Sandra could "realize that her daughter is capable of doing better. . ." Cottam testified that children need loving adults, including both their parents and grandparents.

Cottam believes that Krystal was a fit and appropriate parent based upon her interactions with Krystal as well as the findings of the two parenting assessments. Krystal has frequently expressed to Cottam that she wants additional time with Liam. Krystal has shown up to every family therapy session even when Liam has not and has been patient with him, keeping her composure when he stayed in the car and refused to attend family therapy. Cottam testified that Krystal has shown good parenting behaviors.

Cottam was not consulted by Benshoof regarding Benshoof's recommendation that all contact between Krystal and Liam cease. Cottam believed that ongoing therapeutic visits were beneficial to both Krystal and Liam and should continue. Cottam also recommended that additional visitation occur between Krystal and Liam outside of family therapy for the two to have more fun and light activities.

Cottam believed a continued relationship between Krystal and Liam would be beneficial for Liam because it is good for children to have relationships with adults who love them, specifically relatives. Cottam testified that from her position as a psychologist, Krystal was exhibiting parental fitness. Cottam did not have any safety concerns regarding Krystal.

Cottam was then asked if she believed it was in Liam's best interests to "continue a relationship with his mother." The GAL objected on the "same grounds as we discussed with the prior therapist. This is asking the witness to testify to the decision of the Court." The juvenile court stated that Benshoof's best interests testimony did not come in because Krystal "argued ultimate issue. I'm going to sustain the objection. I'm going to be consistent."

Krystal made an offer of proof and asked Cottam if she believed it was in Liam's best interest to terminate Krystal's parental rights. Cottam testified that termination would not be beneficial for Liam as she doubted that he would have ongoing contact with Krystal following termination. She believed Liam needed to continue his relationship with Sandra as well as Krystal, who appeared to Cottam to be doing "extremely well" and was psychologically fit. Additionally, she observed that Liam "seems to like having some kind of interaction with her."

### (g) Note From Liam

The parties stipulated to the juvenile court receiving a letter from Liam in lieu of in camera testimony. Liam's letter states:

Dear Judge

Please don't make me go back to live with my mom. I have been living with my grandma for almost 3 years. I'm afraid my mom is still doing drugs and if I have to go back to her she will leave me with strang [sic] men, and I won't get to go to school. I will have to cook my own food . . . I did not want visits but I was forced to do it . . . I'm almost 10 years old but I'm a very smart boy and I understand a lot for my age . . . I don't want any more visits my mom any more I DON'T WANT TO LIVE WITH MY MOM.

Thank you
love
Liam

### (h) Krystal's Testimony

At the time of trial, Krystal was 18 months sober. Krystal testified "in every aspect of my life, [drug court has] helped me change." Specifically, drug court has helped Krystal work on her self-esteem issues, find a recovery group and support system, and maintain sobriety.

Krystal testified that she attends a weekly recovery support group as well as Alcoholics Anonymous, Narcotics Anonymous, Crystal Meth Anonymous, and co-dependency meetings four to seven times a week. Krystal has been diagnosed with PTSD, anxiety, and depression, and is currently taking medications for her mental health issues as prescribed. Krystal also continues to attend individual therapy and noted that individual therapy is helping her "tremendously."

Though Krystal requested visits with Liam at the Stephen Center, she did not have any because Liam refused to come. Krystal initially agreed to give Liam a break from visits, but she

reached out to Babbel directly and through both her probation officer and individual therapist in April 2022 to set up visits with Liam. Krystal also called Sandra's cell phone from the Stephen Center, but her calls were never answered.

Krystal testified that Liam has shared his fears regarding her relapsing and that she has done her best to assure him that she has been able to maintain sobriety long-term. Krystal believed that Liam is still under the impression that she is using or will use drugs, and that Sandra has told him so. Krystal believes that Sandra has influenced Krystal's relationship with Liam and is trying to keep Liam from her. Krystal acknowledged her past mistakes, including her substance use, but believes she is in the position to resume parenting Liam and that she can be a good mother to him. Krystal stated that she is willing to do whatever is necessary, including communicate with Sandra and attend counseling with her, so that they can both be in Liam's life.

Krystal rented a two-bedroom apartment so that Liam could have his own room if he were to be placed back with her. Krystal is also current with her child support obligation. Krystal acknowledged that she had not been involved in educational or medical decisions regarding Liam since the start of the juvenile case and did not know what school district Liam would be in if he was returned to her care.

Krystal testified that she wants what is best for Liam and believes that it is in Liam's best interests to be reunified with her.

### 3. ORDER

Following the termination trial, the juvenile court entered an order on February 16, 2024, terminating Krystal's rights to Liam. The court found that the GAL had met its burden of proving substantial and continuous neglect, and that Liam had been in out-of-home placement for 15 or more months out of the most recent 22 months, pursuant to § 43-292(2) and (7). The court also found that because Krystal had corrected the conditions that led to Liam being adjudicated under § 43-247(3)(a), the GAL had failed to meet its burden of proving § 43-292(6). The court further found that the GAL had proven that Krystal was unfit and that it was in Liam's best interests to have Krystal's parental rights terminated.

Krystal appeals.

### III. ASSIGNMENTS OF ERROR

Krystal assigns, reordered, that the district court erred in (1) finding that there was clear and convincing evidence to satisfy statutory grounds under § 43-292(2); (2) allowing Lippmann to testify regarding Liam's best interests; (3) not allowing Cottam to testify regarding Liam's best interests; and (4) finding that termination of her parental rights was in Liam's best interests.

### IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

### 1. STATUTORY GROUNDS FOR TERMINATION

The juvenile court found that the GAL had presented clear and convincing evidence to satisfy § 43-292(2) and (7). Krystal assigns that the juvenile court's finding that § 43-292(2) was proven was in error, as Krystal had fully complied with the dispositional plan and was thus no longer neglecting Liam. However, Krystal appears to concede that statutory grounds existed under § 43-292(7) to support termination of her parental rights.

Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *Id*.

Here, Liam has been in out-of-home placement for 15 or more months of the most recent 22 months. Liam was removed from Krystal's care on August 25, 2020. The GAL filed the supplemental motion for termination of parental rights on September 20, 2022. The existence of the statutory basis alleged § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. See *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). Liam has remained out of the home since his removal in August 2020. At the time of filing, Liam had been in out-of-home placement for nearly 25 months. Thus, the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because the GAL presented clear and convincing evidence that Liam had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Krystal's parental rights exists. We will further address Krystal's claim that she has fully complied with the dispositional plan and is rehabilitated in the following section.

### 2. BEST INTERESTS

In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Gabriel B.*, 31 Neb. App. 21, 976 N.W.2d 206 (2022).

### (a) Testimony as to Best Interests

Krystal assigns that the juvenile court erred in receiving Lippmann's testimony as to Liam's best interests and sustaining an objection to Cottam's testimony as to Liam's best interests.

Because the primary consideration in determining whether to terminate parental rights is the best interests of the child, a juvenile court should have at its disposal the information necessary to make the determination regarding the minor child's best interests regardless of whether the

information is in reference to a time period before or after the filing of the termination petition. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

The objections to testimony regarding whether it would be in Liam's best interests to terminate Krystal's parental rights were based upon the proposition that the witness should not testify to the ultimate issue for the juvenile court's determination. The "ultimate issue" rule was an evidentiary rule that prohibited witnesses from giving opinions or conclusions on an ultimate fact in issue because such testimony, it was believed, "usurps the function" or "invades the province" of the jury. See, *State v. Rocha*, 295 Neb. 716, 732, 890 N.W.2d 178, 194 (2017) (quoting 1 McCormick on Evidence § 12 (Kenneth S. Broun et al. eds., 7th ed. 2013 & Supp. 2016), and citing *Chicago, R. I. & P. R. Co. v. Holmes*, 68 Neb. 826, 94 N.W. 1007 (1903); R. Collin Mangrum, Mangrum on Nebraska Evidence 760 (2016); and Fed. R. Evid. 704). Evidence rule 704, which abolished the ultimate issue rule in Nebraska, states that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Neb. Evid. R. 704, Neb. Rev. Stat. § 27-704 (Reissue 2016). See, also, Fed. R. Evid. 704.

Under rule 704, the basic approach to opinions, lay and expert, is to admit them when helpful to the trier of fact. See *Reiber v. County of Gage*, 303 Neb. 325, 928 N.W.2d 916 (2019). Rule 704 does not lower the bar so as to admit all opinions, because rules 701 through 703 provide the bases for exclusion. *Id*. Under these rules, a witness may not give an opinion as to how the case should be decided, but, rather, must leave the conclusions to be drawn by the trier of fact, because such opinions are not helpful. *Id*.

We note that the Nebraska Evidence Rules do not apply in cases involving the termination of parental rights. See *In re Interest of Gabriel B.*, 31 Neb. App. 21, 976 N.W.2d 206 (2022). Instead, due process controls and requires that the State use fundamentally fair procedures before a court terminates parental rights. *Id*. Nonetheless, we find Nebraska's abolition of the ultimate issue rule to be instructive.

Additionally, in juvenile cases, it is common practice for various case professionals, including both caseworkers and therapists, to testify as to the child's best interests at a termination trial. *See, In re Interest of Kendra M. et al.*, 283 Neb. 1014, 1026, 814 N.W.2d 747, 756 (2012) (children's therapist testified that termination was in best interest of two of children and that it was in best interest of third child to have "stability"); *In re Interest of Kassara M.*, 258 Neb. 90, 601 N.W.2d 917 (1999) (child's therapist testified that termination was in child's best interest); *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024), *review denied* (May 8, 2024) (caseworker testified that termination was in children's best interests); *In re Interest of Jessalina M.*, 32 Neb. App. 98, 994 N.W.2d 106, *review granted* (Sept. 13, 2023), *affirmed*, 315 Neb. 535, 997 N.W.2d 778 (2023) (caseworker testified that termination was in child's best interests); *In re Interest of Jay'Oni W. et al.*, 31 Neb. App. 302, 979 N.W.2d 290 (2022) (caseworker testified that termination was in children's best interests).

Furthermore, Nebraska appellate courts have highlighted instances where the State has failed to sufficiently elicit opinions from its witnesses as to whether termination is in the best interests of the children. See, *In re Interest of Justine J. & Sylissa J.*, 288 Neb. 607, 849 N.W.2d 509 (2014) (finding no clear and convincing evidence that termination of mother's parental rights was in children's best interest as only caseworker and no therapist testified to best interests); *In re*

*Interest of Mya C. et al.*, 23 Neb. App. 383, 397, 872 N.W.2d 56, 67 (2015) (finding no clear and convincing evidence that termination of father's parental rights was in children's best interest as only caseworker testified that reunification would not be in best interests of children "at this time.").

Krystal argues that the juvenile court erred in allowing Lippmann to testify regarding Liam's best interests as Lippmann did not have sufficient interaction with Liam and Krystal, did not have sufficient knowledge about the history of the case, and was not sufficiently qualified to render an opinion about the best interests of Liam. We find that these arguments go to the appropriate weight to give Lippmann's opinion testimony, and not whether it was improper for the juvenile court to receive Lippmann's testimony on the issue of Liam's best interests. Under rule 704, the basic approach to opinions is to admit them when helpful to the trier of fact. See *Reiber v. County of Gage, supra*. Consistent with our rules of evidence and appellate caselaw allowing caseworkers to testify regarding a child's best interests, we cannot say that the juvenile court erred in receiving Lippmann's best interests testimony.

Similarly, we agree with Krystal that the court erred in not allowing Cottam to testify regarding Liam's best interests. Cottam facilitated family therapy between Krystal and Liam from January to August 2023 and was one of the few case professionals who observed Krystal and Liam interacting together. Cottam's testimony would have been relevant and helpful information to make the determination regarding the minor child's best interests. See, *In re Interest of Aaron D., supra*; Neb. Evid. R. 704.

Nevertheless, we find the error in omitting Cottam's ultimate best interests opinion to be harmless, as she gave sufficient testimony to reach the ultimate conclusion that the termination of Krystal's parental rights was not in Liam's best interests, as we discuss further below.

### (b) Best Interests Analysis

Krystal assigns that the juvenile court erred in finding that the termination of her parental rights was in Liam's best interests. Krystal argues that she has fully complied with her case plan and that her "ongoing efforts to achieve reunification negate a finding that it is in Liam's best interests for this court to terminate her parental rights." Brief for appellant at 30.

In light of the constitutionally protected nature of the parent-child relationship, there is a rebuttable presumption that it is in the child's best interests to share a relationship with his or her parents. *In re Interest of Denzel D., Jr.*, 314 Neb. 631, 992 N.W.2d 471 (2023). The presumption that it is in the child's best interests to share a relationship with his or her parent can *only* be overcome by a showing that the parent either is unfit to perform the duties imposed by the relationship or has forfeited that right. *Id.* (emphasis supplied). Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being. *Id*.

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). While both are separate inquiries, each examines essentially the same underlying facts. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's

continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

Evidence at the termination trial demonstrated that for the first half of the juvenile case, Krystal was largely noncompliant with her dispositional plan. Krystal struggled to clean her home beyond the main level and to consistently attend visitation and meaningfully engage with Liam, and she failed and falsified various kinds of drug tests.

However, in January 2022, Krystal was accepted into the drug court program and entered treatment at the Stephen Center in March. Krystal completed both residential and IOP treatment at the Stephens Center and was successfully discharged in July 2022. She moved from the Stephens Center to a sober living house before finally moving into her own apartment in November 2022. Both Babbel and Hagedorn testified that Krystal's apartment is clean and safe. Krystal's apartment is large enough to give Liam his own room. Krystal has been employed since November 2022, is current with her child support obligation, and was recently promoted at work.

Krystal has been able to sustain her sobriety since her discharge from the Stephen Center. Hagedorn testified that Krystal has been excelling through the drug court program and was on track to graduate in December 2023. Krystal attends support group meetings at least four times weekly and has continued her individual therapy.

Babbel testified that Krystal has met all her case plan goals, which included maintaining sobriety, having a clean home, and managing her mental health. Though it took some time, Krystal has completed the entirety of her dispositional plan. Krystal has accepted responsibility and has been willing to discuss her past substance use with Liam during family therapy. Krystal's most recent parenting assessment noted no concerns and Cottam opined that Krystal is a fit parent. Cottam believes that it would be beneficial to Liam to continue in family therapy and visitation with Krystal.

The only barrier remaining in the case is Liam's resistance to attending visitation with Krystal. Krystal did not see Liam from the time she entered the Stephen Center in March 2022 until family therapy began in January 2023. Despite the August 28, 2020, order granting Krystal supervised visitation remaining in full effect, and Krystal requesting visits with Liam at the Stephen Center, Babbel did not set up visitation between Liam and Krystal for much of 2022 due to Liam's refusal to attend. Additionally, Babbel made no effort to set up family therapy despite Krystal's updated parenting assessment recommending the therapy to safely reestablish a connection between Krystal and Liam. Krystal had to motion the juvenile court in September 2022 to enforce her rights to visitation with Liam.

We acknowledge that Krystal has not graduated from supervised visitation and that Liam displayed increasingly distressed and agitated behaviors regarding visits with Krystal. However, we are also troubled by the fact that Liam began expressing hesitancy regarding being in Krystal's care in late 2021, and began to resist attending visitation in the spring of 2022, yet therapy was not arranged for Liam by the Department until October 2022.

Most significantly, Cottam, who has had the most exposure to Liam and Krystal together in a therapeutic setting, has observed Krystal to be fit and appropriate with Liam. Krystal takes an interest in Liam and thinks of ways to engage him during family therapy sessions, such as bringing activities and the family dog. As recently as a few months before trial, Liam sought physical closeness with Krystal and expressed an openness to spending the night at her apartment. Krystal

has also been responsive to Liam's concerns surrounding her past substance use. Krystal brought a children's book regarding a parent's addiction and gave Liam her 1-year sobriety chip. Cottam has noticed affection between Krystal and Liam and that family therapy sessions, once underway, were typically playful and relaxed.

Based on our de novo review of the record, we conclude that the GAL failed to prove that Krystal is unfit, and the juvenile court erred in finding her to be unfit. There was substantial evidence that Krystal was a fit parent to perform her duties as a parent at the time of trial. See *In re Interest of Denzel D., Jr.*, 314 Neb. 631, 992 N.W.2d 471 (2023).

The Nebraska Supreme Court held in *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014), that because the State had failed to rebut the presumption that the father was a fit parent, there was no need to determine whether termination of the father's parental rights was in the child's best interests. Accordingly, the court reversed the termination of the father's parental rights. The Supreme Court has also concluded in cases where the State or GAL has failed to prove a parent unfit, it follows that termination of parental rights is not in the best interests of the child. See, *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023); *In re Interest of Mateo L. et al.*, 309 Neb. 565, 591, 961 N.W.2d 516, 534 (2021) (finding the State failed to meets its "heavy burden" of clearly and convincingly proving mother's unfitness; thus termination was not in children's best interests); *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009).

The Nebraska Supreme Court has emphasized that the Due Process Clause of the U.S. Constitution would be offended "[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness." *In re Interest of Mateo L. et al.*, 309 Neb. at 582, 961 N.W.2d at 529 (internal quotation marks omitted) (quoting *Quilloin v. Walcott*, 434 U.S. 246, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978)). See, also, *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016) (termination of parental rights is final and complete severance of child from parent and removes entire bundle of parental rights; therefore, with such severe and final consequences, parental rights should be terminated only in absence of reasonable alternative and as last resort).

Though Liam and Krystal still need to repair their bond, because Krystal has shown herself to be a fit parent through her substantial efforts to rehabilitate herself, we conclude that the GAL failed to prove that Krystal is an unfit parent, and likewise failed to rebut the presumption that it is Liam's best interests to continue a relationship with Krystal. Accordingly, we reverse the order of the juvenile court terminating Krystal's parental rights to Liam. We remand the cause for further proceedings.

## VI. CONCLUSION

For the reasons stated above, we reverse the order of the juvenile court terminating Krystal's parental rights to Liam and remand the cause for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.